*In re* ROBERTO RIVERA ESCALERA, Juez del Tribunal de Distrito de Puerto Rico.

Núm. 1.

*Sometido:* 18 de mayo de 1953. *Resuelto:* 24 de junio de 1953.

*Hon. Secretario de Justicia José Trías Monge, José C. Aponte y Guillermo Gil Rivera, Fiscales Especiales Generales,* abogados del querellante; *Isaías Rodríguez Moreno, Guillermo Bauzá* y *Carmelo Ávila Medina,* abogados del querellado.

*Per curiam:* El 8 de abril de 1953 el Secretario de Justicia de Puerto Rico, en cumplimiento de los términos de la resolución dictada por este Tribunal con fecha 16 del mes anterior, formuló contra Roberto Rivera Escalera, Juez del Tribunal de Distrito de Puerto Rico, una querella cuyos cinco cargos copiados al pie de la letra rezan así:

### "PRIMER CARGO

"Allá para uno de los días del mes de abril de 1952, durante las horas de la noche, mientras se encontraba haciendo uso de bebidas embriagantes en compañía de varios amigos en el restaurant 'El Chévere', en Aguadilla, Puerto Rico, que es un sitio público, el querellado Roberto Rivera Escalera, observó una conducta ilegal, inmoral e impropia de un magistrado al disparar como disparó su revólver en presencia de varias personas contra una máquina tocadora de discos (vellonera), propiedad del dueño de dicho establecimiento, señor Raúl López Gamio, ocasionándole al mecanismo de la misma daños por valor de $52.

### "SEGUNDO CARGO

"En o alrededor del día 19 de diciembre de 1952 y en el establecimiento comercial del señor Ramón Añeses Arrache, en la calle Victoria, de Aguadilla, Puerto Rico, el querellado Roberto Rivera Escalera, Juez del Tribunal de Distrito de Puerto Rico, y mientras se encontraba bajo los efectos de bebidas embriagantes, observó una conducta ilegal, inmoral e impropia de un magistrado al irrumpir en el mencionado establecimiento comercial e interrumpir como interrumpió una investigación que estaban practicando allí y en aquellos momentos el Lic. José

L. Purcell, abogado de la Oficina del Director Administrativo de los Tribunales, y el Fiscal Julio Fernández Cabrera, en relación con los hechos a que se refiere el PRIMER CARGO de esta querella, observando allí y entonces el querellado una conducta desordenada y ofensiva haciendo uso de lenguaje soez y palabras obscenas en presencia de los mencionados funcionarios investigadores y de varias otras personas, viéndose obligados dichos funcionarios a suspender la investigación que estaban practicando.

## "TERCER CARGO

"En o alrededor del día 19 de diciembre de 1952 en la calle Victoria, de Aguadilla, Puerto Rico, minutos después de ocurridos los hechos a que se refiere el SEGUNDO CARGO, el querellado Roberto Rivera Escalera, Juez del Tribunal de Distrito de Puerto Rico, y mientras se encontraba bajo los efectos de bebidas embriagantes observó una conducta ilegal, inmoral e impropia de un magistrado al alterar, como alteró la paz y tranquilidad del inmediato vecindario, sacando, mostrando y exhibiendo como sacó, mostró y exhibió públicamente en su mano derecha un revólver, en actitud violenta, colérica y amenazadora, al mismo tiempo que se conducía en forma desordenada y ofensiva y provocaba a los ciudadanos Arturo Lausell Ubiñas y Luis Lausell Ubiñas.

## "CUARTO CARGO

"Allá para uno de los días del mes de diciembre de 1952 y en Aguadilla, Puerto Rico, el querellado Roberto Rivera Escalera, Juez del Tribunal de Distrito de Puerto Rico, observó una conducta inmoral e impropia de un magistrado consistente la misma en que a sabiendas de que el Honorable Juez Juan B. Zamora, Juez del Tribunal de Distrito de Puerto Rico y el Fiscal Julio Fernández Cabrera habían ordenado a la Policía de Aguadilla el día 19 de diciembre de 1952 que radicaran denuncias contra el querellado y los ciudadanos Luis Lausell Ubiñas y Arturo Lausell Ubiñas por un delito de Alteración a la Paz Pública con motivo de los hechos a que se refiere el TERCER CARGO de esta querella, se personó el querellado en el Cuartel de la Policía de dicha ciudad y valiéndose de su condición de magistrado instruyó a los policías a cargo de la preparación de denuncias en dicho cuartel, señores Juan Nieves Badillo y Rosendo Pellot, para que no se radicara la mencionada denun-

cia por Alteración a la Paz Pública en su contra ni contra el ciudadano Arturo Lausell Ubiñas, informándoles y haciéndoles creer a dichos agentes del orden público que así lo habían dispuesto el Fiscal Julio Fernández Cabrera y el Juez Juan B. Zamora, información ésta que era falsa y cuya falsedad le constaba al querellado.

"QUINTO CARGO

"Allá para uno de los días del mes de enero de 1953 y en el sitio conocido por 'El Tamarindo', en la carretera de Aguadilla a Isabela, el querellado Roberto Rivera Escalera, Juez del Tribunal de Distrito de Puerto Rico, observó una conducta ilegal, inmoral e impropia de un magistrado al instar como instó al ciudadano Orlando Marchand González, testigo esencial de los hechos objeto del PRIMER CARGO de esta querella para que cambiara los términos de la declaración jurada que en relación con dichos hechos había prestado el mencionado testigo ante el Fiscal Julio Fernández Cabrera, con el fin de que ayudara en esa forma al querellado en la investigación que sobre su conducta estaba practicando dicho fiscal y el Lic. José L. Purcell, abogado de la Oficina del Director Administrativo de los Tribunales."

Termina la querella con la solicitud de que, previo los trámites legales pertinentes, se dicte resolución destituyendo al querellado permanentemente de su cargo de Juez de Distrito.

En el ejercicio de nuestra discreción, y a solicitud del Secretario de Justicia, decretamos el mismo día de la radicación de la querella la suspensión de empleo y sueldo del querellado mientras se sustanciaba el presente procedimiento. En igual fecha ordenamos al márshal de este Tribunal que notificara al querellado con copia de la querella, de conformidad con la sección 24 de la Ley de la Judicatura, (¹) y concedimos a éste un término de 20 días para contestar o formular las alegaciones que estimare pertinentes.

[¹] La sección 24 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico (Núm. 11 de 24 de julio de 1952 ((2) pág. 31)) dispone:

"Sección 24.—*Procedimiento para la Destitución.*—

"Cualesquiera cargos que se formularen contra cualquier juez del Tri-

Luego de solicitar una prórroga al efecto, el querellado contestó el primer cargo de la querella del siguiente modo:

"En relación con el primer cargo el querellante admite que allá para uno de los días del mes de abril de 1952, se encontraba en una reunión de carácter social en el Restaurant 'El Chévere', en Aguadilla, Puerto Rico, en compañía de unos amigos de intachable reputación, y que mientras se encontraba en esa reunión estaba bajo los efectos de una intensa crisis emocional cuyas causas sería impropio revelar por tratarse de asuntos íntimos y personales relacionados con terceras personas, hizo un disparo de revólver accidentalmente y sin la intención de causar daños a personas o propiedad ajena, pero que desgraciadamente le ocasionó daños a una máquina tocadora de discos (vellonera) propiedad del dueño del establecimiento, quien fué indemnizado por el querellado de los daños causádosle. El querellado expre-

---

bunal de Primera Instancia serán presentados ante el Director Administrativo de la Oficina de Administración de los Tribunales, quien informará de ello al Juez Presidente, y si el Tribunal Supremo así lo desea, recomendará la acción ulterior a tomarse o el archivo de los cargos. El Tribunal Supremo ordenará que se practique la investigación que creyere conveniente y podrá solicitar del Secretario de Justicia que practique tal investigación y rinda un informe al Tribunal.

"Si el Tribunal Supremo determinare que existe causa para ulteriores procedimientos, podrá solicitar del Secretario de Justicia o de cualquier funcionario del Tribunal que radique la correspondiente querella. El Secretario de Justicia también, a iniciativa propia, o por orden del Gobernador, podrá iniciar el procedimiento para la destitución de un juez y entonces actuará como querellante. El procedimiento se iniciará mediante querella dirigida al Tribunal Supremo imputándole al juez conducta inmoral o negligencia en sus deberes judiciales. El Tribunal dará a las partes la oportunidad de ser oídas, en unión a sus testigos y el Tribunal podrá en su discreción mientras se sustancia el procedimiento suspender al Juez de empleo y sueldo. Si el Tribunal considerare que los cargos, o parte de ellos, han sido probados, podrá censurar o suspender al juez querellado, o destituirlo permanentemente de su cargo según, bajo las circunstancias concurrentes, creyere que sea la pena más adecuada.

"Los jueces del Tribunal Supremo podrán ser destituídos solamente mediante el procedimiento de residencia establecido por la Constitución del Estado Libre Asociado."

Las anteriores disposiciones de la Ley de la Judicatura fueron aprobadas por nuestra Asamblea Legislativa de conformidad con la autoridad conferídale por la Sección 11 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico, que en lo pertinente dice así:

"*Los jueces de los demás tribunales podrán ser destituídos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley.*" (Bastardillas nuestras.)

samente niega los demás hechos y conclusiones contenidas en dicho cargo,"

negando los hechos expuestos en los cargos segundo, tercero, cuarto y quinto de la querella y planteando como defensa especial que este Tribunal carece de jurisdicción para entender en los hechos alegados en el primer cargo. (²)

La vista de la querella comenzó el 18 de mayo a las 9 a.m., ante una sala compuesta de tres de los jueces de este Tribunal. A ella compareció el querellado en persona y asistido de sus abogados. El Secretario de Justicia también compareció por dos de sus fiscales especiales generales. Al iniciarse la misma el querellante suscitó la cuestión de que toda vez que el querellado en su contestación admite los hechos alegados en el primer cargo, bajo las condiciones ya reseñadas, la contención del querellante era que los hechos en él imputados son de tal naturaleza que los mismos podían producir la destitución del querellado, por lo cual a su juicio podía someter el recurso. El querellado sostuvo que la contención del querellante era tardía. La Sala se reservó el fallo sobre dicha cuestión y entró seguidamente a oír la prueba de ambas partes con relación a todos los cargos contenidos en la querella. Ahora diremos que toda vez que en la contestación, así como en la contestación enmendada, el querellado admite los hechos alegados en el primer cargo en forma condicionada—como se ha visto—la cuestión suscitada debe ser, y es, declarada sin lugar. Pasemos a los méritos de la querella.

Tanto el querellante como el querellado adujeron abundante prueba oral y documental, continuando la vista durante

(²) En una contestación enmendada presentada posteriormente "el querellado admite los hechos alegados en el primer cargo, pero alega que los realizó bajo los efectos de una intensa crisis emocional cuyas causas sería impropio revelar por tratarse de asuntos íntimos y personales, relacionados con terceras personas. Alega además que indemnizó al dueño del establecimiento por los daños causádosle a la máquina tocadora de discos (vellonera)," niega los hechos expuestos en los cargos segundo, tercero, cuarto y quinto de la querella y renuncia a su defensa especial de falta de jurisdicción.

todo el día indicado y hasta la madrugada del siguiente, cuando después de manifestar los fiscales que no deseaban informar oralmente y luego de hacerlo brevemente uno de los letrados del querellado, el caso quedó sometido a nuestra consideración.

Hemos estudiado detenida y cuidadosamente la totalidad de la prueba ofrecida, así como la transcripción del informe oral a que hemos hecho referencia. Como resultado de ese estudio, y luego de considerar todos los elementos de prueba pertinentes, dirimimos el conflicto en la prueba y llegamos a las siguientes

### Conclusiones de Hechos

En la noche del 13 de abril de 1952 el querellado y un grupo de amigos suyos se encontraban en el restaurante "El Chévere", de Aguadilla, donde habían ido a "comerse un cabro". Todos los concurrentes, incluyendo el querellado, tomaron licor. La vellonera que allí había tocaba el disco "Y Sin Embargo Te Quiero". El mismo le trajo ciertos recuerdos al querellado; éste se levantó, sacó su revólver y disparó contra ella, causándole daños. Poco después se trasladó a la casa de Orlando Marchand González, mecánico de radio, y le pidió que le acompañara en su automóvil hasta el citado restaurante para que reparara la máquina de tocar discos. Llegó a la casa de Marchand González en estado de embriaguez y así condujo su automóvil. Marchand González se trasladó con el querellado hasta "El Chévere" y allí vió los daños causados a la vellonera por el disparo. Al día siguiente Ramón Añeses Arrache, vendedor de dichos tocadiscos, ordenó por telégrafo al agente de éstos en San Juan las piezas necesarias para la reparación de la vellonera, siendo el costo de la reparación, ascendente a $52.60, pagado por el Juez Rivera Escalera.

Con motivo de los hechos arriba expuestos, alguien formuló contra el querellado una queja ante la Oficina de Administración de los Tribunales. Siguiendo órdenes superiores

el Lic. José A. Purcell se trasladó el 19 de diciembre de 1952 a Aguadilla para investigar lo ocurrido. Como el Lic. Purcell no estaba autorizado para tomar juramentos, al llegar a Aguadilla solicitó la cooperación del fiscal Julio Fernández Cabrera. Los Lics. Purcell y Fernández Cabrera se trasladaron a la oficina de Ramón Añeses Arrache, patrono de Orlando Marchand González. Mientras interrogaban a éste se presentó súbitamente en dicha oficina el querellado y al verlos les dijo en alta voz y en forma violenta: "Esto es lo que yo quería saber, qué era lo que hacían ustedes . . . Lausell es un hijo de la gran p ... y yo me bato a tiros con cualquiera y con Héctor Reichard también." El querellado estaba violento y demostraba haber tomado licor. Los Lics. Fernández Cabrera y Purcell trataron de calmarlo, recomendándole el primero que se fuera para San Juan, para así evitar cualquier incidente. El querellado no siguió ese consejo e insistió en que a él le correspondía permanecer en Aguadilla. Con motivo de ello el Lic. Purcell dió por terminada la investigación encomendádale.

Inmediatamente después de ocurridos los hechos relatados en el párrafo anterior y siendo ya cerca de las 5 de la tarde, el querellado se paseaba frente a los establecimientos comerciales de Ramón Añeses Arrache y Luis Lausell. Mientras tal cosa hacía, el querellado vió a Arturo Lausell, lo llamó y le preguntó si él defendía a su hermano, a lo que Arturo le contestó: "Cómo no, si es mi hermano", replicando el querellado "Con ése es que quiero batirme y con usted también." Luis Lausell, hermano de Arturo, estaba cerca de allí. Los ánimos continuaron exasperándose y tanto el querellado como Luis Lausell sacaron a relucir revólveres, pero no apuntaron hacia nadie en particular ni hicieron uso de los mismos. Se dijeron frases fuertes y en alta voz, tanto por el querellado como por los Lausell. El policía Ángel Laboy Morales acudió al lugar de los hechos, registró a Luis Lausell y le ocupó un revólver. Minutos después los hermanos Lausell fueron arrestados y el policía Laboy le pidió

al Juez Rivera Escalera que le acompañara al cuartel, donde investigados los hechos por el fiscal Fernández Cabrera se dieron por éste y por el juez de distrito Juan B. Zamora órdenes de que acusaran al querellado y a los dos Lausell del delito de alterar la paz y además a Luis Lausell del delito de portar armas.

Al siguiente día, o sea, el 20 de diciembre de 1952, se presentó el querellado en el cuartel y manifestó a los policías que allí estaban, que el juez Zamora mandaba a decir que se denunciara a Luis Lausell por alterar la paz y portar armas, y que no denunciaran a Arturo Lausell ni a él por alterar la paz, siendo tal cosa incierta.

Un domingo del mes de enero de 1953 Orlando Marchand González, acompañado de su ayudante Luciano Yulfo, iba en una guagüita *pick-up* por el sitio llamado Tamarindo, de Aguadilla. Se tropezaron con el querellado, quien estaba en su automóvil cerca del Bar "La Quince" y quien les hizo señal de que le siguieran. Al llegar todos frente al cementerio el querellado se detuvo y así lo hizo Marchand González, bajándose ambos de sus vehículos respectivos. Rivera Escalera le pidió a Marchand González que le protegiera al declarar ante los fiscales, que no le perjudicara y que "si podía cambiar la declaración en algo sin perjudicarlo a él que lo hiciera," a lo cual Marchand González contestó negativamente porque ello podía perjudicarle a él.

De los autos surge asimismo una cuestión que consideramos verdaderamente seria. Tenemos de una parte que el querellado admite el primer cargo que le ha sido formulado, o sea que estando con un grupo de amigos en el restaurante "El Chévere", de Aguadilla, y luego de haber bebido y comido hizo un disparo de revólver contra una vellonera; y de la otra que al declarar bajo juramento el día 6 de febrero de 1953, es decir unos diez meses más tarde, ante el Lic. Honorato Pandolfi, fiscal designado por el Secretario de Justicia para que practicara una investigación sobre ciertos cargos administrativos formuládosle al querellado, éste

manifestó, en relación con el incidente acaecido en la noche del 13 de abril de 1952 en el mencionado restaurante, lo que pasamos a copiar textualmente:

"·     ·     ·     ·     ·     ·     ·     ·

"F.—Ahora colega Rivera Escalera, después de lo más reciente a lo más antiguo, yo invito su atención hacia lo ocurrido una noche del mes de mayo de 1952 en el restaurant El Chévere, de Aguadilla, en el cual resultó rota una vellonera a causa de unos disparos de revólver que allí se hicieron, ¿cuál es la verdad de lo ocurrido?

"T.—Esa noche yo no recuerdo el día exacto; desde por la mañana yo compré un cabro que íbamos a comernos. Entonces invité unos amigos míos; invité al Dr. Simmons, al Dr. Torres.

"F.—¿Cómo es el primer nombre del Dr. Torres?

"T.—Plácido Torres. Israel Roldán Blas y otros amigos para comernos el cabro en el restaurant El Chévere.

"F.—¿Ud. fué quien llevó el cabro al restaurant El Chévere?

"T.—Sí, señor.

"F.—¿Lo llevó vivo?

"T.—Sí, señor.

"F.—¿Allí lo prepararon?

"T.—Sí, lo prepararon.

"F.—¿A qué hora empezó la reunión?

"T.—Nosotros dejamos la reunión para por la noche por la experiencia de los cocineros para degollarlo, lo dejamos para por la noche. Como a las siete y treinta más o menos empezamos a reunirnos; llegó el Dr. Simmons y el Dr. Torres y los otros amigos, nos dimos una cerveza.

"F.—¿Todos tomaron cerveza?

"T.—Yo tomé cerveza.

"F.—¿Antes de empezar a comer?

"T.—Sí, antes de comer, porque el cabro lo empezaron a preparar tarde.

"F.—¿A qué hora se reunieron?

"T.—De siete y treinta a ocho.

"F.—¿Entonces en lo que se servía se tomaron unas cuantas cervezas?

"T.—Sí, unas cuantas.

"F.—¿Después de eso comieron?

"T.—Después de eso nos comimos el cabro. En un momento dado mientras estábamos reunidos hablando, platicando, esta-

ban las cosas sobre la mesa. Entonces solicité o le pedí al dependiente que estaba en la barra atendiendo a la cantina le dije que me vendiera una caja de cigarrillos, me dijo que se le habían acabado. Salí del negocio a buscarlos, fuí al negocio que le dicen El Central, bastante retirado del sitio. Ahí me encontré con otros amigos y me tomé otra cerveza en el negocio donde vine a comprar los cigarrillos y me tomé otra cerveza. Volví al negocio y el señor Raúl López me llamó y me dijo que le habían roto la vellonera. Yo le dije no se ocupe, no hay problema, todo se paga y estuvimos un rato más y nos fuimos.

"F.—¿Ud. no vió la vellonera rota?

"T.—Esa noche no.

"F.—Cuando usted le dijo eso, ¿Raúl López no se fijó si era serio?

"T.—La vellonera la pegaron detrás del seto.

"F.—¿Entonces ud. salió según ud. dice? ¿Ud. sabe si sus amigos se quedaron allí?

"T.—Sí, señor.

"F.—¿Cuando ud. regresó estaban ellos bebiendo?

"T.—Sí, estaban.

"F.—¿Estaban todos los amigos que ud. había dejado?

"T.—El Dr. Simmons se había ido.

"F.—¿Estaba el Dr. Torres y los demás tomando?

"T.—Sí, señor.

"F.—¿El Dr. Simmons se había ido?

"T.—Por cierto que yo pregunté por él y me dijeron que se había ido.

"F.—¿Como a qué hora se acabó esa reunión?

"T.—Como a las once y quince u once y treinta.

"F.—¿Todos salieron con ud. del establecimiento, ya se había ido el Dr. Simmons?

"T.—Sí, señor.

"F.—¿Cómo se rompió la vellonera?

"T.—No sé la forma en que se rompió la vellonera, yo sé que a consecuencia de un disparo. Yo supe que se había roto de un disparo que había hecho el señor Israel Roldán Blas. Entonces yo cogí mi carro, pasé por el negocio de Ramón Añeses y le dije vete por el negocio de Raúl López a reparar la vellonera que anoche los muchachos se la rompieron. Dí unas vueltas y volví al Chévere y me encontré al mecánico Marchand, estaba el Dr. Torres y estaba Israel Roldán Blas. El mecánico

le quitó el cristal y el Dr. Torres le preguntó que cuánto valdría eso; el muchacho le dijo yo no sé cuánto vale el cristal ése y además no sé si tiene algo roto adentro. Le quitó el cristal, cogió una escoba que tenía, limpió el mecanismo, el cerebro mágico y le sacó las partículas del cristal y la vellonera funcionó, entonces la puso a funcionar. Cuando el Dr. Torres le preguntó cuánto valdría la reparación yo le dije a Torres que yo le había dicho a Raúl que yo la pagaría, la reparación fuera lo que fuera.

"F.—¿Por qué ud. se hizo cargo de la reparación?

"T.—Esa misma pregunta me la hizo Snyder. Porque tratándose de un sitio que yo sabía que me podía producir cualquier discusión en relación con ese hecho y tampoco en la forma que había ocurrido eso y los daños que tenía la vellonera, yo asumí la responsabilidad. Al otro día le escribí una carta al señor Negroni en Santurce en la cual le decía y como yo no rompí o destruí la vellonera en parte, tratándose de una fiesta de amigos en la cual yo me encontraba, yo me hago responsable de pagar los daños y al mismo tiempo le pedí que el estimado sea razonable. Entonces a los pocos días me escribe una carta con un papel diciéndome lo que valía el cristal y una parte de pasta que lleva el cerebro mágico que también se dañó. Al recibir el estimado le extendí un cheque a favor del señor Raúl López.

"F.—¿A cuánto sumó la cuenta de la vellonera?

"T.—Unos cincuenta y pico de pesos.

"F.—¿Es o no cierto colega que esa noche de ese cabro en El Chévere ud. llevaba consigo a ese sitio un disco que se titula 'Y Sin Embargo Te Quiero'?

"T.—Lo tenía en la vellonera tocando.

"F.—¿Es o no cierto que se tocaba ese disco?

"T.—Yo no.

"F.—¿Ese disco se tocó en esa noche?

"T.—Se tocaba.

"F.—Es o no cierto que con motivo de haber puesto a funcionar la vellonera, mientras se tocaba ese disco, ud. fué blanco de una broma por parte de unos amigos?

"T.—No es cierto, ¿bromas en qué sentido?

"F.—De que ese disco o algo relacionado entre el disco y una novia de quien se dice ud. está enamorado y que ud. ha acompañado varias veces?

"T.—No hubo bromas ni nada.

"F.—¿Se tocó sin dificultad alguna?

"T.—No hubo dificultad.

"F.—¿Ud. me asegura bajo juramento que en el momento que la vellonera fué rota con un balazo ud. no se encontraba allí?

"T.—No me encontraba.

"F.—¿Se encontraban todos menos el Dr. Simmons?

"T.—Él estaba cuando yo salí del sitio.

"F.—¿Cuando ud. regresó estaban todos menos el Dr. Simmons?

"T.—Menos el Dr. Simmons.

"F.—¿Quién le informó a ud. que había sido el señor Roldán Blas el que había roto de un balazo esa vellonera?

"T.—Cuando vino el mecánico Raúl me lo dijo primero por la mañana.

"F.—¿Que había sido rota de un balazo?

"T.—Raúl me dijo que había sido rota de un balazo.

"F.—¿Quién le dijo que había sido el señor Roldán Blas?

"T.—Ricardo López, hermano de Raúl.

"F.—¿Al otro día por la mañana?

"T.—Al otro día por la mañana.

"F.—¿Ud. vió si esa noche el señor Roldán Blas tenía un arma de fuego?

"T.—No señor. Sobre eso quiero aclarar lo siguiente: Por la mañana cuando me enteré que había sido con un disparo de Roldán, que él había sido, le pregunté con qué revólver había sido, entonces me dijo que había sido con el mío. Me dijo, como tú dejaste el gabán en la silla donde estabas sentado yo lo cogí y entonces el Dr. Torres me lo agarró y ahí fué que se zafó el tiro. Entonces yo fuí al cuarto y busqué el revólver que yo había dejado encima de la mesa, lo abrí y noté que había una bala disparada.

"          .          .          .          .          .          .

"F.—¿Ud. dice que ud. había salido cuando sucedió ese acto?

"T.—Sí, yo había salido.

"          .          .          .          .          .          .

"T.—Quiero hacer la aclaración de que solamente hubo un disparo.

"F.—¿Cómo lo sabe ud. que hubo un disparo y no dos o tres?

"T.—Porque yo ví la vellonera y solamente tenía una perforación en el cristal del frente; habiéndose cometido ese acto con el arma mía, yo al examinar mi revólver me dí cuenta que había solamente una sola bala disparada.

"F.—¿El acto fué en una forma violenta?

"T.—Yo no puedo decir eso, no hubo tumulto ni hubo violencia. Lo que hubo (fué) una broma por parte del Dr. Torres que le fué a quitar el pincho de revólver para verlo, fué una broma no hubo discusión; le dijo dame acá ese revólver para verlo.

"...                .        .        .        .        .        .        .

"F.—Ahora dígame, ¿no es cierto que ud. lo admitió antes de ahora haber sido quien disparó, bajo los efectos de los tragos tomados, contra esa vellonera?

"T.—Yo no le he admitido a nadie absolutamente a nadie haberle disparado a esa vellonera.

"F.—Ahora dígame, si yo le trajera a personas que estaban allí con ud. y personas que se enteraron de esos hechos, que dijeran que fué ud. el que por motivo de un disco que se tocaba y por motivo que le dieron una broma ud. sacó su revólver y disparó contra el disco y luego quiso reparar el daño material de lo que había sucedido?

"T.—Yo estoy dispuesto que no hay persona alguna en Puerto Rico ni Aguadilla que yo haya admitido, el que me haya visto a mí disparar. Si alguna persona lo dice es natural, llegando a la conclusión de que alguien lo ha dicho a esa persona, tiene que ser como ordenado, preparado o comprado para declarar tal cosa o alguna persona que está sentida de mí o es que le debe su subsistencia a otra persona que está interesada de hacerme daño.

"...                .        .        .        .        .        .        .

"F.—¿Entonces ud. compañero, ud. niega haber disparado un tiro en el restaurant El Chévere en la noche del mes de mayo de 1952?

"T.—Sí, yo lo niego.

"...                .        .        .        .        .        .        ."

Y de otra parte tenemos que no sólo en su contestación admitió el querellado que los hechos imputados en el primer cargo ocurrieron en la forma imputádale, sino que él mismo ocupó la silla testifical y bajo la fe del juramento prestado admitió haber mentido en su declaración al fiscal Pandolfi, manifestando que era cierto que había disparado su revólver la noche en cuestión contra una máquina tocadora de discos, pero explicando, sin embargo, que ello se debió a que la noche

anterior se había encontrado con su novia, empezaron a hablar, y ella, quien antes había aceptado casarse con él, le comunicó su decisión de no hacerlo, de no casarse, lo que produjo en él una crisis emocional que se exacerbó al oír el disco que hemos mencionado, haciendo en esos momentos el disparo a la vellonera.

Aparece además en los autos, ofrecida por el querellante, una carta dirigida en 21 de mayo de 1952 por el querellado a José A. Negroni, representante en Puerto Rico de las velloneras Seeburg, similares a la que había sido averiada. En esa carta Rivera Escalera da una tercera versión de lo ocurrido en el restaurante El Chévere, diciendo a Negroni, entre otras cosas, lo siguiente:

"Es mi propósito informarle que allá para uno de los días del mes de abril estuve en el restaurant del señor López en unión a otros amigos celebrando una pequeña fiestecita.

"Uno de mis amigos se puso a jugar con una botella de Coca Cola con tan mala suerte que la misma fué a dar contra el cristal de la vellonera astillándolo y rompiendo al mismo tiempo el gorro que cubre el cerebro de la vellonera. Yo, como es natural, acepté pagar los daños para evitarme contratiempos. . . . ."

La Ley de la Judicatura dispone que el procedimiento para la destitución de un Juez del Tribunal de Primera Instancia "se iniciará mediante querella dirigida al Tribunal Supremo imputándole al juez conducta inmoral o negligencia en sus deberes judiciales." "Conducta inmoral" ha sido definida como aquélla que es voluntaria, flagrante o poco pundonorosa y que revela indiferencia moral ante el criterio de ciudadanos respetables de la comunidad. *In re Hicks*, 20 P. 2d 896; *Paust* v. *Georgian*, 179 N. W. 735.

Todos y cada uno de los cargos formulados han quedado plenamente probados. Son graves en verdad, y no sólo es ello así, sino que la evidencia aducida ha demostrado, además, que el querellado, persona investida de la difícil tarea de impartir justicia a sus semejantes, faltó intencionalmente a la verdad.

Merece fuerte censura la actitud del querellado imputando desde la silla testifical al abogado Héctor Reichard, de Aguadilla—quien no estaba presente—conducta reñida con la ética profesional al tratar de ejercer influencia indebida en sus decisiones judiciales y obtener favores mediante regalos. Su propio testimonio demostró lo infundadas de sus imputaciones.

*En vista de lo antes expuesto se dictará resolución ordenando la destitución del querellado Roberto Rivera Escalera del cargo de Juez del Tribunal de Distrito de Puerto Rico.*

Los Jueces Presidente Sr. Snyder y Asociado Sr. Sifre no intervinieron.