*In re* HON. LUIS G. MARRERO TORRES, JUEZ DE DISTRITO.

*Número:* O-79-246      *Resuelto:* 10 de junio de 1982

*Héctor A. Colón Cruz, Procurador General, Eliadís Orsini Zayas, Procuradora General Auxiliar*, abogados de El Pueblo; *Libertad Díaz Ortiz, Rodolfo Cruz Contreras, R. Elfrén Bernier, José A. Cangiano*, y *Heriberto Febus Bernardini*, abogados del querellado.

PER CURIAM: Previo los trámites correspondientes, el Procurador General presentó una querella en la que imputaba al juez querellado el siguiente cargo:

El día 20 de agosto de 1978 el Juez de Distrito Luis G. Marrero Torres incurrió en conducta ilegal, impropia y altamente reprensible, obstruyendo la justicia al llevarse consigo a un detenido de nombre Carlos Silva Rodríguez evitando que lo sometieran a la prueba del alcoholímetro en el Cuartel de la Policía del Municipio de Juana Díaz luego de que el patrullero Luis A. Morales detuviera a éste en la Autopista Las Américas bajo sospecha de que estaba guiando en estado de embriaguez.

En esa misma fecha, en el Cuartel de la Policía del Municipio de Juana Díaz, indebidamente el Juez de Distrito Luis G. Marrero Torres ejerció presión sobre el policía Luis A. Morales amenazándole de [*sic*] que le impondría un desacato si no se le complacía en su solicitud de que se le diera una oportunidad al detenido Carlos Silva Rodríguez, e impropia-

mente el citado Juez influenció y presionó al teniente de la policía Luis A. De Jesús Santos para que éste, en consideración al hecho de que el querellado es Juez, en aquel momento se le complaciera en dicha petición. Allí en el cuartel, frente a varios policías, reiteradamente el Juez querellado insistió en lo anterior alegando su condición de magistrado para la exigencia y concesión de su solicitud.

En consecuencia, el Procurador General lo acusó de haber violado los Cánones I, XXI, XXIII y XXVI de los de Ética Judicial. Nos sometió la querella para que este Tribunal determinase la acción que proceda. Así haremos. Art. V, Sec. 11 de la Constitución; Sec. 24 de la Ley de la Judicatura, Ley Núm. 11 de 24 de julio de 1952, según enmendada, 4 L.P.R.A. sec. 232; Informe de la Comisión de la Rama Judicial en la Convención Constituyente, *Diario de Sesiones de la Convención Constituyente*, Ed. Equity, 1961; T. 4 L.P.R.A., pág. 2614.

El Canon I, en lo pertinente, dispone lo siguiente:

En el ejercicio de su delicada función, aquellos llamados a impartir justicia, conscientes de la posición que ocupan en la sociedad y de la trascendencia de su misión, deben velar por que sus actuaciones respondan a normas de conducta que honren la integridad e independencia de su ministerio y estimulen el respeto y la confianza en la judicatura.

El Canon XXI dispone que:

. . . El Juez debe evitar particularmente dar base para la sospecha razonable de que pueda estar utilizando las prerrogativas o influencias de su cargo para su beneficio personal o de otras personas.

El Canon XXIII, en lo pertinente, dispone que:

. . . El Juez no debe influir ni directa ni indirectamente, para conseguir colocarse en mejor situación que cualquier otro ciudadano en el litigio de sus causas personales.

El Canon XXVI establece que las normas anteriormente enumeradas no son las únicas normas de ética que obligan al juez.

El Comisionado Especial que nombramos para ver la prueba en este caso, el abogado Aníbal Medina Tolentino, ex-Juez Superior, determinó como cuestiones de hecho que: (1) en la fecha de los hechos el juez querellado se llevó del Cuartel de la Policía de Juana Díaz a Carlos Silva Rodríguez, evitando así que éste fuese sometido a la prueba del alcoholímetro, luego de que fuera detenido en la carretera por el policía de patrulla Luis A. Morales, bajo sospecha de que estaba conduciendo en estado de embriaguez un vehículo de motor; (2) que en dicha fecha y en el mencionado Cuartel el querellado insistió ante varios agentes del orden público en llevarse a Silva Rodríguez, indicándole al policía Morales que él tenía autoridad para imponerle un desacato si no le permitía llevarse al referido individuo; y (3) que el querellado es una persona que goza de buena reputación. Tales determinaciones tienen base en la prueba.

Es evidente que el querellado violó los Cánones I y XXI. Una lectura de los fragmentos antes citados de dichos Cánones demuestra claramente que la acción del querellado contravino los mismos. Su acción no hizo honor a su deber como juez ni estimuló el respeto y la confianza que la ciudadanía debe tener en la judicatura del país. La acción del querellado fue ilegal, altamente impropia y ciertamente demuestra una inhabilidad para el cargo de juez. Cuando un magistrado que está obligado a hacer respetar la ley utiliza la influencia de su cargo para impedir que ésta se cumpla no merece seguir desempeñando el alto ministerio que le fue conferido. Procede la destitución del querellado del cargo de Juez de Distrito.

*Se dictará la correspondiente sentencia.*

—O—

RESOLUCIÓN

San Juan, Puerto Rico, a 20 de octubre de 1982

A la moción de reconsideración presentada el 18 de junio de 1982 por el juez querellado, no ha lugar.

Lo acordó el Tribunal y certifica la Secretaria General. El Juez Asociado Señor Díaz Cruz emitió opinión disidente. El Juez Asociado Señor Rebollo López disintió sin opinión. El Juez Asociado Señor Irizarry Yunqué no intervino.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz.

Estoy convencido de que por falta de información crítica, como la enmienda y reducción del cargo por el señor Procurador General y el historial de 21 años de servidor público del juez querellado, es contraria a derecho y a fundamental justicia la destitución acordada en nuestro per curiam de 10 junio, 1982. Hemos usado un tanque de guerra para matar un coquí.

> . . . [P]uede darse el caso en que una irregularidad por sí sola no justifique la destitución de un juez pero una serie de irregularidades sí puede justificarla, pues una serie de irregularidades demuestra un patrón de conducta impropio e incompatible con la función judicial. *In re Jackson Sanabria*, 97 D.P.R. 1, 4 (1969).

Esta aseveración accede a nuestra jurisprudencia hace más de trece años para cuya época los conceptos éticos de nuestra sociedad en general todavía ni comenzaban a experimentar el derrumbe y colapso en marcha al presente, dramáticamente expuesto por un señor alcalde que hace unos días manifestó que nada malo hay en robar votos. Nos reafirmamos en que hoy, como ayer, ni los jueces ni los abogados sometidos a juicio de su conducta tienen derecho a invocar como atenuante el nuevo estilo de moral decadente que como agua de inundación contamina todos los resquicios. La magistratura tiene, frente a esta quiebra de valores, la obligación reiterada de constituirse en ejemplo y austero reducto de fundamental decencia e integridad, pues hacia

ella mira el pueblo con la fe puesta en que su resistencia a la corrupción y la inmoralidad general constituya el germen de una restauración colectiva de los valores perdidos. Ni en aquellos mejores tiempos de *In re Jackson Sanabria,* supra, ni menos ahora, aun cuando mantengamos irreductible el bastión moral de la magistratura, podemos exigir de nuestros jueces so pena de ser fulminados con el rayo de la destitución, la perfección del hombre santo, candidato a canonización.(¹) Las flaquezas que son parte de la morfología orgánica del *homo sapiens* no se evaporan en el aire porque éste vista la toga del magistrado. Es con la humildad cristiana nacida de esta consciencia que debemos acercarnos a juzgar a nuestros congéneres, y reservar el rayo de Zeus, el castigo devastador, para los casos de extremo agravio al orden social. Todavía repercuten con el vigor de pura moral cristiana las palabras de nuestro anterior Juez Presidente, Señor Negrón Fernández, al disentir en *In re Jackson Sanabria,* supra, a la pág. 17:

> Yo también, como parte del Tribunal que escuchó la extensa y conflictiva prueba pasada en este procedimiento durante cinco días consecutivos, he buscado el fondo de verdad que el juzgador quiere siempre descubrir en la prueba que ante él desfila, para llegar a la convicción moral de la certeza de los hechos y dejar así satisfecha su conciencia judicial.
>
> Creo que en un procedimiento contra un juez por cargos de conducta inmoral, no debemos ser menos exigentes en la norma sobre el grado de prueba requerido para la destitución —porque el procedimiento se caracterice como *sui generis*— que en la norma sobre el grado de prueba requerido para una convicción en un procedimiento de naturaleza penal. La razón me parece evidente: en un procedimiento penal se puede perder la libertad, pero ésta puede recobrarse. En un procedimiento contra un juez por cargos de conducta inmoral, la destitución por sí misma destruye su reputación como persona humana —y esa sí que es difícil de recobrar.

_____

(¹) Aun entre éstos los hubo falsos e inmerecedores a quienes la Iglesia con el tiempo ha removido de su lista de iluminados.

El único cargo de conducta impropia contra el juez querellado se funda en haber tomado bajo su custodia el 20 agosto, 1978 [2] —e impedir que la Policía lo retuviera por guiar en estado de embriaguez— al ciudadano Carlos Silva, persona de más de 60 años, que era uno de los participantes ese día en un juego de *softball* con el equipo "Old Timers" de una liga del Área Sur que presidía el querellado. Fue un equivocado acto de compañerismo deportivo. El citado Silva fue posteriormente convicto y condenado al pago de $100 de multa y reclusión por 15 días suspendida a condición de mejoramiento. El cargo contra el juez le imputaba haberse llevado a Silva del Cuartel de la Policía en Juana Díaz imponiéndose a los policías con la autoridad de su cargo usando influencia y presión y aun la amenaza de desacato.

El primer indicio de que ésta no es falta que inevitablemente conlleve destitución lo tenemos en el hecho de no haberse suspendido al juez en su empleo y sueldo y sí permitirle continuar en su cargo por los cuatro (4) años siguientes hasta que el caso fue visto ante el Comisionado Especial, anterior Juez Superior, Sr. Aníbal Medina Tolentino. El segundo indicio de falta aminorada surge cuando se ofrece al Comisionado una estipulación del querellado y el Procurador en que éste enmienda el cargo al efecto de eliminar toda imputación de *obstrucción de justicia,* limitándolo a su toma bajo custodia del acusado mediante solicitud "para que se le diera una oportunidad al detenido", [3] acompañada de referencia a su autoridad para imponerle un desacato si no se le complacía. El querellado no evadió la responsabilidad por sus actos y aceptó el cargo enmendado y considerablemente reducido por la eliminación del elemento de obstrucción de la justicia. Inadvertidamente, nuestro per curiam no captó la decisiva enmienda. Así de

---

[2] Sólo hacía siete meses que se le había nombrado Juez de Distrito.

[3] Sabemos que en las cárceles de Puerto Rico han muerto por violencia de confinados, personas detenidas en sumaria.

facilitada su labor, el Comisionado añade su final determinación: "El querellado es una persona de buena reputación", que en todo su peso ha de aceptar este Tribunal por correcto, y máxime cuando no ha sido impugnada. *In re Pérez Portela*, 82 D.P.R. 261 (1961).

El 10 junio, 1982 emitimos el per curiam en que ordenamos la destitución del juez. Su moción de reconsideración, presentada ocho días después nos movió a solicitar de la Administración de Tribunales un informe respecto a "cual haya sido la conducta pública y privada del querellado desde agosto, 1978 hasta el presente en el desempeño continuado de sus funciones de Juez"; así como la posición del Procurador General. El Gobierno evade la cuestión central de proporcionalidad sobre el grado o magnitud de la ofensa, que redujo considerablemente al eliminar la imputación de obstrucción de la justicia mediante enmienda al cargo único. La Administración ratifica en su informe la conclusión del Comisionado en cuanto a ser el querellado un funcionario de buena reputación; revela que una queja contra él fue promovida por el Dr. Capella, Alcalde de Utuado, en 1978 por haber absuelto a un miembro de la Asamblea Municipal con la que el ejecutivo municipal se hallaba en pugna. La queja fue archivada. Hubo otra queja en 1978 porque actuando el juez querellado en la Sala de Comerío no quiso atender a Rosa M. Otero quien solicitaba una orden para ingresar a su hijo en el Hospital de Siquiatría. Se archivó por falta de evidencia que sostuviera la misma.

El informe de Administración señala al querellado como un laborioso juez general, con un promedio anual de 1,693 casos resueltos mantenido a través de cuatro años; a pesar de la naturaleza itinerante de su cargo, los certificados de las distintas salas a las que se le ha asignado no reflejan ausencia alguna; los jueces[4] a quienes la Administración

---

[4] Con excepción del Sr. Rubén Hernández Rosario, Juez Superior de Utuado, quien dijo que al querellado "le perturbaba" que apelaran sus decisiones. Esto ciertamente no lo incluye en especie en peligro de extinción.

pidió datos sobre la conducta oficial y privada del querellado sostienen su idoneidad y buenas relaciones públicas: La Juez Administradora del Tribunal de Distrito de San Juan señora Nieves de Van Rhyn expresa que no se le informó de problema alguno durante los períodos que allí sirvió el querellado; la Juez Administradora de Ponce, Srta. Leida González Degró destaca la laboriosidad del querellado según estado comparativo y dice no haber "recibido quejas o querellas del público ni de funcionarios del Tribunal sobre la conducta del Juez Marrero" excepto que se tomaba algunas tardes;[5] y el Juez Administrador de Caguas, Sr. Julio Berríos Jiménez dice que durante el mes que estuvo asignado allí, el trabajo del querellado fue satisfactorio. En el informe de la Administración de los Tribunales se anexa un estudio comparativo de la labor de los jueces de distrito por el período 1978–79 a 1981–82 según cuya estadística el querellado mantuvo un promedio de casos criminales resueltos más alto que otros jueces generales y jueces de distrito; y una notable actividad en casos civiles con promedio de 21.54% que compara con el de 34.97% de los jueces de distrito con sala asignada.

Completa el historial del querellado, funcionario público durante veintiún años, su participación en el deporte de béisbol, miembro del equipo olímpico de los Centroamericanos de Caracas, 1959; cinco años de servicio como Abogado de la Policía de Puerto Rico; Abogado del Municipio de Ponce; sirvió durante dos años como Oficial Probatorio de Adultos; un año como Oficial Probatorio Juvenil; cinco años en la prevención y control de la delincuencia juvenil en la ciudad de Nueva York; un año como Especialista de Emigración con el Departamento del Trabajo; cinco años como Supervisor de Trabajo Social con Acción Comunal de Puerto Rico. (Simultáneamente estudiaba en la Sesión Nocturna de la Escuela de Derecho de la Universidad Católica.)

---

[5] Tampoco esto debe desencadenar el rayo de Júpiter sobre su cabeza.

Erramos al no considerar el historial de servicio público de este juez y al saturar de fatalidad irreversible un acto aislado, excepción única en su conducta personal, profesional y judicial.

Este infortunado incidente en la vida del querellado no reviste la intensidad de conducta inmoral, flagrante o poco pundonorosa que justificó la destitución de otro juez de distrito en *In re Rivera Escalera*, 75 D.P.R. 43, 57 (1953). Una carrera de servidor público dedicado, sin mancha en sus largos años de servicio, no debe ser anulada por un solo momento de flaqueza en que la severidad del magistrado cedió a su instinto deportista para evitar que el viejo compañero de equipo fuera encarcelado en sumaria de noche, pues se le intervino en la Autopista Las Américas a las 9:15 p.m.

Ni aun el propio juez procesado niega haber faltado a la ética judicial. En su contestación admitió que su conducta violó el Canon XXI que sanciona aquella conducta del juez que pueda dar base a la sospecha de que usa las prerrogativas o influencia de su cargo para beneficio de otra persona. Mas la solución de este caso no está en la total aniquilación de este miembro de la judicatura. Durante los cuatro años que siguieron a su desgraciada noche, él ha demostrado que puede continuar sirviendo con decoro, dignidad y eficiencia. Las cortes y juntas de disciplina judicial en ambas jurisdicciones de los Estados Unidos cuya severidad es de conocimiento general, no dispensan destituciones automáticamente sino que tomando el caso de cada juez en la integridad de su circunstancia, con frecuencia limitan la sanción a una suspensión en el ejercicio del cargo. Estimo que esta última debe ser la solución adecuada en el presente caso y que la destitución debe sustituirse por una suspensión de seis meses.

A tales fines, reconsideraría la decisión obtenida en el per curiam.