*In re:* MODESTA JACKSON SANABRIA, JUEZ DEL TRIBUNAL DE DISTRITO, SALA DE JUANA DÍAZ, querellada.

*Número:* FC-66-1     *Resuelto:* 21 de febrero de 1969

2

Honorable Secretario de Justicia, Lcdo. *Rafael Hernández Colón, José C. Aponte, Fernando Vizcarrondo* y *Manuel J. Viera Mercado, Charles Figueroa Álvarez* y *Carlos Noriega, Fiscales Especiales Generales,* abogados del querellante; *Leopoldo Tormes García, Ángel Viera Martínez, Arturo Cintrón García, Miguel Velázquez Rivera, William Morales Torres, Práxedes Álvarez Leandri,* abogados de la querellada.

I

PER CURIAM: En 17 de junio de 1966 el entonces Secretario de Justicia de Puerto Rico, Honorable Rafael Hernández Colón, presentó ante este Tribunal, a tenor con la ley para tales casos provista, (1) una querella contra Modesta Jackson Sanabria, Juez de Distrito. Mediante dicha querella el Secretario de Justicia le imputó a la querellada conducta inmoral, impropia y represible, y le formuló ocho cargos a los cuales nos referiremos en el curso de esta opinión y los cuales aparecen copiados *verbatim* en el Apéndice de la misma.

Este caso fue visto por el Tribunal en Pleno durante los días lunes 5 a viernes 9 de diciembre de 1966. Desfiló considerable prueba de cargo y de defensa. Como ocurre general-

(1) Sec. 24 de la Ley de la Judicatura, Ley Núm. 11 de 24 de julio de 1952, según enmendada, 4 L.P.R.A. sec. 232.

mente en los procesos (²) en que desfilan testigos a favor y en contra de una persona, hubo declaraciones conflictivas, y cosas que se afirman por unos y que se niegan por otros. Compete, desde luego, al juzgador de los hechos, el que ve y oye a los testigos declarar, la delicada misión de aquilatar esa prueba, descartar lo que parezca exageración, separar lo que cree cierto de lo que cree que no lo es y finalmente llegar a sus conclusiones propias. Así lo hemos hecho.

En este caso, como era de esperarse, la prueba de cargo fue tendente a sostener los cargos formulados y la de defensa a contradecirlos. Una forma de defensa—no queremos llamarla táctica—que utilizó la defensa fue la de querer dejar establecido que los testigos de cargo albergaban animosidad contra la querellada. Aparte de que debido a la conducta de la querellada en el descargo de sus funciones oficiales pudo dar motivo a animosidad justificada, e independientemente también de si había o no animosidad y de si ésta era injustificada o no, el argumento de la animosidad incurre en la falacia de *non sequitur*. Los testigos no estaban siendo juzgados. Lo que debíamos y debemos resolver es si la querellada, una Juez de Distrito, incurrió o no en conducta que justifique o que haga necesaria su remoción de nuestra Judicatura, en defensa de ésta, de nuestro estado de derecho y de los derechos humanos más elementales que todos decimos defender. Es claro que la acusación de animosidad debe tomarse en cuenta al apreciar la prueba y al juzgar la veracidad o falta de ella de los testigos. Eso hemos hecho. Aún descontando lo que puede ser producto de las inevitables pasiones humanas que un procedimiento de esta naturaleza

---

(²) Utilizamos el vocablo "procesos" en su sentido lato. No es este un procedimiento penal, sino uno civil, cuasi administrativo, aunque *sui generis*. Es un procedimiento de la Rama Judicial, germano con su función de administrar justicia, instituido para su auto-limpieza, para conservarse a sí misma vigorosa, prestigiosa y saludable. *In re Marín Báez*, 81 D.P.R. 274, 280 (1959); *Sarisohn* v. *Dennison*, 281 N.Y.S.2d 475, 478 (1967).

4

desencadena, luego de ver y oir la prueba y de meditar sobre la misma concluimos que los cargos fueron probados.

◼ Seis de los cargos, tomados independientemente uno de los otros, no justifican cada uno de por sí una destitución. Sin embargo, creemos que dos la justifican y, más aún, la hacen necesaria. Los otros, tomados cada uno por separado, podrían justificar una suspensión o tal vez una censura. Como se ha resuelto, puede darse el caso en que una irregularidad por sí sola no justifique la destitución de un juez pero una serie de irregularidades sí puede justificarla, pues una serie de irregularidades demuestra un patrón de conducta impropio e incompatible con la función judicial. *Pérez* v. *Meraux*, 197 So. 683 (1940). Así también puede calificarse el caso de autos.

◼ Consideramos de utilidad aclarar lo siguiente en relación con nuestro estatuto sobre destitución de jueces. La ley dispone que "El procedimiento [para la destitución] se iniciará mediante querella dirigida al Tribunal Supremo imputándole al juez conducta inmoral, impropia, o reprensible, o negligencia en sus deberes judiciales." (3) Eso no quiere decir que cada vez que surja la penosa necesidad de formular una querella contra un juez es necesario alegar todas esas causas. Unos hechos pueden justificar esos cuatro calificativos pero otros hechos pueden justificar solamente uno, o dos, o tres de los mismos. Por ejemplo, una conducta puede ser impropia y reprensible pero no necesariamente inmoral. Desde luego, una conducta inmoral es a la vez impropia y reprensible. También puede imputarse negligencia en el cumplimiento de los deberes judiciales sin imputarse inmoralidad. Así, en este caso creemos que un cargo envuelve inmoralidad en el más profundo sentido de la palabra y los otros siete no envuelven necesariamente inmoralidad pero sí comprenden conducta impropia.

---

(3) Véase el escolio 1.

██ Como, según hemos indicado, creemos que dos de los cargos justifican y hacen necesaria la destitución de la querellada nos limitaremos a examinar con algún detalle estos dos cargos. Uno—el más grave de los ocho imputados—es el cargo quinto. Se probó que en dos ocasiones distintas la querellada intervino con un testigo para variar ilegalmente la prueba. En un caso intervino con el policía Ramón Antonio Rolón y le instó a que éste variase su declaración. Sobre el particular declaró Rolón:

"Luego se citó el caso para verse el día 11 de marzo de 1965 y a las nueve de la mañana. Allí en el tribunal, antes de comenzar a verse los casos en sala, la honorable Juez Modesta Jackson, encontrándose en su oficina, me llamó antes del juicio y me instó a que informara que en ningún momento había visto los daños, ocurridos por el ganado del señor Loubriel al señor González y que el señor Ramón Ferrer era un buscón, y el señor Loubriel era un hombre bueno. Que yo le informé a la honorable Juez Modesta Jackson que eso no podía ser, porque con qué moral yo iba, verdad, a decirle que . . . lo contrario; que yo iba a sostener lo que yo había visto; que era un caso de propio conocimiento mío; que yo iba a decir lo que había visto." T.E. pág. 214.

En otra ocasión la querellada intimidó a un niño de 12 años de edad, de sexto grado de escuela, que sería testigo en un caso, para que éste no declarase en contra de determinada persona. El niño, José A. Santiago Rodríguez, declaró como sigue:

"P. ¿Qué pasó después que tu observaste ese accidente?

R. Fui a la corte.

P. ¿Con quién fuiste a la corte?

R. Con . . . con . . . con el . . . con el policía que lo investigó.

P. ¿A quién viste, si viste a alguien, en la corte?

R. .    .    .    .    .    .    .    .

P. ¿Con quién hablaste en la corte?

R. Ah, con la señora Jackson.

P. Con la señora Jackson. ¿Sobre qué hablaste con la señora Jackson en la corte?

R. Sobre lo que había visto del accidente.

P. ¿Qué . . . qué le dijiste a la juez del accidente?

R. Pues, yo ví . . . yo le dije que yo vi cuando el señor Domingo Ramos atrapilló al hijo.

P. ¿Le dijiste tú?

R. . . . . . . . .

P. ¿Qué hizo o qué dijo la juez Jackson cuando tú le dijiste que había visto a Domingo Ramos atrapillar al hijo?

R. Que si yo declaraba en contra . . . en contra de Domingo Ramos me mandaba a la 'Corriccional.'

P. ¿A dónde?

R. A la 'Corriccional'.

P. ¿Pero tú ya habías declarado o no?

R. Sí, había declarado.

P. ¿A quién?

R. No, todavía.

P. ¿No habías declarado? ¿No le habías dicho a la juez lo que tú habías visto?

R. No, todavía.

P. ¿Y en qué momento fue que la juez te dijo de que te iba a mandar a la Correccional?

R. Cuando yo iba a explicar lo que había pasado.

P. Cuando ibas a explicar. ¿Le declaraste tú a la juez?

R. No, no llegué, porque ella no me dejó.

P. ¿Por qué no le declaraste.

R. Porque me dijo eso.

P. ¿Porque te dijo qué?

R. Que me iba a mandar a la 'Corriccional', si declaraba en contra del señor Domingo Ramos.

P. Entonces, ¿a base de lo que ella te dijera, que te iba a mandar, fue que no declaraste?

R. No me atreví hablar." T.E. págs. 240–242.

Este cargo quinto es el cargo que hemos dicho que envuelve una inmoralidad en el más profundo sentido de la palabra. Envuelve la más grave lesión posible al procedimiento judicial de parte de quién más obligado está a velar por su limpieza: el Juez. Constituye una herida mortal dirigida al corazón del procedimiento judicial: la veracidad de la prueba. No hay duda de que un Juez que incurre en esa

práctica no puede permanecer en la Judicatura. Dicha conducta incluye tal "indicio de inmoralidad . . . que incapacita al juez para actuar como tal y merecer la confianza pública." (⁴)

Se ha resuelto que el favoritismo en el desempeño de los deberes judiciales constituye corrupción tan desastrosa en sus consecuencias como si se hubiese tomado un soborno. El abuso intencional de la discreción judicial se ha calificado como la conducta oficial más opresiva y dañina. *In re Bolte*, 90 N.Y.S. 499, 512 (1904). También se ha resuelto que una decisión judicial basada en motivaciones impropias o en favoritismo hacia un litigante o su abogado es causa para la destitución. *In re Capshaw*, 17 N.Y.S.2d 172, 186 (1940) ; *In re Bolte*, supra. También se ha resuelto que la conducta de un juez de inducir a un testigo a retener evidencia o a no declarar es causa justificada para su destitución. *Kirkpatrick* v. *State*, 9 S.W. 574 (1928).

El otro cargo que consideramos sumamente grave, por ser lesivo a los derechos humanos fundamentales de la dignidad del ser humano y de estar protegido contra ataques abusivos a su honra, reputación y vida privada, (⁵) es el cargo séptimo. Sobre todo, esto es así si se tiene en cuenta que la querellada incurrió en él en más de una ocasión, pues el cargo segundo es de igual naturaleza. Estos dos cargos comprenden dos ocasiones distintas en que la querellada atropelló de palabra a dos señoras en el tribunal sin causa justificada. En los hechos comprendidos en el cargo séptimo la querellada hizo ir al tribunal a la señora Emma Rita Franceschi, mediante citación oficial servida a través de un

---

(⁴) Informe del Comité que redactó el proyecto de la Ley de la Judicatura, citado en el historial de la Sec. 232 del Título 4 de L.P.R.A. y en la Opinión del Juez Sr. Hernández Matos, con la concurrencia del Juez Sr. Santana Becerra, en *In re Gallardo*, 81 D.P.R. 19, 66 (1958).

(⁵) Constitución de Puerto Rico, Art. II, Secs. 1 y 8.

policía con el único fin de increparla sin motivo para ello y de amenazarla con enviarla a la cárcel. Este cargo séptimo unido al cargo segundo constituyen un patrón de conducta impropia y demuestran por sí un abuso del poder público confiado en manos de la querellada.

En cuanto a los demás cargos basta decir lo siguiente. La querellada esencialmente admite el cargo cuarto. Lo niega "por la forma en que está redactado" pero "acepta haber casado las personas a que se refiere dicho cargo," dos niñas de 13 años de edad. Dicho cargo constituye dos violaciones claras de ley. No tildaremos de inmoral la conducta de la querellada en cuanto a este cargo pero no hay duda de que fue impropia.

El tercer cargo se refiere a una orden de la querellada dictada en estos términos: "No se admitirán fianzas después de las 10:00 de la noche ni por la Juez ni por el secretario de esta Sala." Desde luego este cargo envuelve una falta de cumplimiento del deber que constituye en los términos del estatuto "negligencia en sus deberes judiciales." Dicho abandono del deber pudo ocasionar importantes violaciones de derechos constitucionales de los ciudadanos. Algunos tribunales han considerado que la negativa ilegal de admitir fianzas, que de otro modo eran admisibles, como una trasgresión que justifica la destitución. *Saint* v. *Meraux*, 111 So. 691 (1927).

Hemos mencionado los cargos segundo, tercero, cuarto, quinto y séptimo. En cuanto a los cargos restantes, el primero, el sexto y el octavo, se refieren a conducta personal de la Juez en lugares públicos. Se le imputa reunirse en público con personas del bajo mundo (bolita, operador de casa de lenocinio) y otras formas de conducta poco deseables. Aun si tomásemos la actitud de descartar gran parte de la prueba de cargo sobre el particular, los propios testigos de la defensa aportaron detalles específicos que demuestran que hay una medida suficiente de verdad en esas imputaciones como para

que las creamos censurables. Por ejemplo, uno de los personajes con quien la querellada frecuentaba sitios públicos era Daniel Cintrón Torres. Contra este señor los tribunales han dictado por lo menos las siguiente once sentencias criminales: tres años de presidio por transportar mujeres para fines inmorales; de dos a nueve meses de cárcel por posesión de armas; tres meses de cárcel por infracción al Art. 132 del Código Penal (soborno de testigos); tres meses de cárcel por acometimiento y agresión grave; tres meses de cárcel por otro delito de acometimiento y agresión grave; tres meses de cárcel por otro delito de acometimiento y agresión grave; tres meses de cárcel por acometimiento y agresión grave; dos a cinco años de presidio por atentado a la vida; $50.00 de multa por ataque para cometer homicidio; y dos sentencias de uno a dos años de presidio por infracciones a los Arts. 6 y 7 de la Ley de Armas. [6]

El testigo de defensa Emilio Colón Soto declaró que Daniel Cintrón opera un motel llamado "La Arboleda"; que ha oído que él estuvo "en Atlanta y esas cosas."

Otro testigo de defensa, Hipólito Díaz, calificó la reputación de Arcadio Ramos (otra persona cuya compañía frecuentaba la querellada) de "dudosa" y de "mala." Otro testigo de defensa, Leopoldo Vega, declaró que Daniel Cintrón visitaba el tribunal; que la querellada se mudó a una casa propiedad de Daniel Cintrón sita en la urbanización Del Carmen en Juana Díaz y en cuanto a la reputación de Daniel Cintrón declaró como sigue:

"P—¿Conoce usted . . . Usted dice que conocía la reputación del Sr. Daniel Cintrón?

R—Sí, señor.

P—¿De qué reputación gozaba ese señor?

R—Bueno, tiene una casa de . . . ¿cómo se llama? Un motel.

---

[6] Exhibits 1-B, 1-A, 5, 5-E, 5-F, 5-G, 5-H, 5-I, 5-C, 5-D y 5-A del querellante.

P—¿Que es casa de qué?

R—Bueno, un motel.

P—¿No ha sido él nunca acusado de casas de lenocinio?

R—Sí, señor; ha sido acusado.

P—¿En relación con qué casa, con qué negocio o con qué establecimiento? ¿No es en relación con ese mismo motel?

R—Sí, señor." T.E. pág. 67.

Otro testigo de defensa, el Sargento Hipólito Díaz López declaró que en una ocasión la querellada le indicó que fuese a presenciar una investigación que hacía un Capitán de la Policía para que luego le dijese a ella lo que allí se hacía, a lo cual el testigo se negó. En relación con eso el testigo, más adelante, declaró lo siguiente:

"P—Entonces, qué le dijo ella a usted como resultado de eso cuando usted le dijo que era confidencial, que en eso no podía complacerla?

R—No recuerdo.

P—No recuerda. Mire a ver si lo que le dijo fue esto ella: 'Que no me moleste más este márshal porque si yo no lo puedo agarrar antes por algo anormal que él haga, le voy a bloquear su nombramiento de Alguacil cuando llegue el mismo al Senado en el mes de marzo del año que viene.'

R—Hizo esos comentarios, pero. . . .

P—Los hizo; ahora usted se recuerda, verdad, que hizo ese comentario?

R—Sí." T.E. pág. 22.

Aun si a los fines de apreciar la prueba descartamos liberalmente gran parte de lo aducido por los testigos de cargo, queda un residuo considerable de esa prueba que creemos verídico reforzado por la luz que sobre estos hechos arrojan las declaraciones de los propios testigos de defensa, que nos hace concluir que todos los cargos fueron probados y que todos tomados en conjunto justifican la destitución de la querellada. La prueba demostró que la querellada no tiene la menor conciencia de la naturaleza del cargo de magistrado, lo cual la incapacita para ejercer la difícil tarea de juez en nuestra Judicatura. Lo antes reseñado demuestra un patrón

de conducta a través de un demasiado largo período de tiempo (los cargos incluyen hechos ocurridos en los años 1963, 1964 y 1965) que la ha hecho indigna del honor y de la confianza puestos en ella y ofendió por igual a la sociedad y defraudó valores públicos de alta significación de los cuales era depositaria. (⁷)

## II

Creemos que la mejor réplica a la opinión disidente consiste en una lectura cuidadosa de las páginas que anteceden de la opinión del Tribunal en este caso. Cada aseveración factual que allí se hace está conectada con la página correspondiente del récord que la sostiene. Señalamos también la forma mesurada y judicial que ha utilizado el Tribunal en su opinión.

Sin embargo, el tono de la disidencia hace necesario que hagamos unos apuntamientos adicionales.

Una pulcra sumisión a los hechos demuestra que la opinión disidente adolece de exageraciones e insinuaciones no sostenidas por la prueba y de una seria distorsión que pasamos a señalar. Se exagera fuera de toda proporción y se trata de caracterizar de "casi un estado de sitio policial" lo manifestado por el Teniente Primero de la Policía Julio López en su declaración en el sentido de que tenía instrucciones de informar sobre las irregularidades de los Jueces. Se dice que esas eran "órdenes de la Superintendencia." Veamos cómo se desinfla esa argumentación tan pronto examinamos con fidelidad el récord. La realidad es que esa instrucción no fue iniciativa de la Policía sino que partió de la Administración de los Tribunales. Así consta de la propia minuta de una reunión rutinaria de oficiales de la Policía, parte de cuya minuta se llevó al récord y en cuya reunión el Licenciado Olivo, Asesor Legal de la Policía, informó sobre una entre-

---

(⁷) V. Opinión del Juez Asociado Señor Santana Becerra en *In re Gallardo*, 81 D.P.R. 19, 77, 80 (1958).

vista suya con el Administrador General de los Tribunales. En la página 130 de la transcripción de evidencia puede leerse lo siguiente:

"El Licenciado Olivo distribuyó opinión reciente del Tribunal Supremo sobre arrestos. Habló sobre entrevista con el Licenciado Mongual, Administrador General de los Tribunales, quien desea saber donde se observen irregularidades de los jueces, ausencias en fines de semana, problemas al someter casos, opiniones o actuaciones adversas, insultos y abogados posponiendo casos esperando jueces específicos. Se envíen estos informes a Operaciones de Campo."

No creemos que para la aplicación de la ley debe haber dos varas. Una para los ciudadanos, los servidores públicos más humildes—los policías, los inspectores de sanidad, etc.— y otra para los de mayor jerarquía. Si no hay nada malo en preocuparse porque los policías, los inspectores de sanidad y los fiscales no cometan irregularidades tampoco hay nada intrínsecamente malo en preocuparse porque los jueces no las cometan. Dada la alta calidad de nuestra Judicatura es muy raro que eso ocurra. Ocurrió en el caso de autos. La correcta defensa de la Judicatura y la que tenemos el derecho de esperar de quién tiene el deber constitucional de velar por la buena administración de los tribunales, consiste en protegerla de personas que incurren en la conducta de la querellada, pues es esa la clase de conducta que podría hacer desmerecer la alta estimación y respeto que a todos nos merece nuestra Judicatura.

Nos preocupa que haya transcurrido tanto tiempo entre la vista de este caso en este Tribunal en diciembre de 1966 y su resolución ahora. En casos de esta naturaleza, si la querella es infundada se le hace la mejor justicia al juez concernido resolviéndolo prontamente. Si la querella es fundada se le hace la mejor justicia a la Judicatura, a la administración de la justicia y al país resolviéndolo también prontamente.

*Por los motivos expresados en la parte I de esta opinión se decretará la destitución de la querellada del cargo de Juez de Distrito.*

El Señor Juez Presidente y el Juez Asociado Señor Santana Becerra disintieron en opinión separada.

Los Jueces Asociados Señores Pérez Pimentel, Hernández Matos y Torres Rigual no intervinieron.

—O—

*In re: Modesta Jackson*
FC-66-1

*A P E N D I C E*

*PRIMER CARGO*

Que allá en o para uno de los días del mes de octubre de 1964, en horas de la noche, la querellada, Modesta Jackson Sanabria, en ocasión en que desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, se reunió en un negocio propiedad del señor Jaime Torres, sito en el Barrio Guanábano, de Juana Díaz, con varias personas de dudosa reputación en la comunidad de Juana Díaz, estando acompañada, además, del individuo de nombre Daniel Cintrón, quien había sido convicto por la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, por el delito de trata de blancas. En esta reunión la querellada, Modesta Jackson Sanabria, consumió bebidas alcohólicas en exceso y al encontrarse en aparente estado de embriaguez observó una conducta inmoral, impropia y reprensible del cargo de un juez de distrito.

*SEGUNDO CARGO*

Que allá en o para el día 29 de marzo de 1965 la querellada, Modesta Jackson Sanabria, en ocasión en que desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, mientras se encontraba en el recinto del Tribunal de Distrito de Juana Díaz, increpó fuertemente de palabras a la señora Ritalina Ramos Cruz, quien había ido al tribunal a querellarse contra una vecina suya por un problema

que tenía, indicándole la juez querellada a dicha señora que su casa era una de lenocinio donde frecuentaban parejas a tener contacto carnal, ordenándole al Teniente de la Policía del Distrito, señor Julio López López, que practicara una investigación sobre la conducta de la señora Ritalina Ramos Cruz y le informara el resultado de la misma. Resultando de la investigación practicada por el Teniente de la Policía que la señora Ritalina Ramos Cruz gozaba de muy buena reputación en la comunidad, era casada con hijos y que vivía en paz y unión con su familia.

Esta conducta es inmoral, impropia y reprensible del cargo de juez de distrito.

### TERCER CARGO

Que allá para el día 23 de diciembre de 1963 la querellada, Modesta Jackson Sanabria, en ocasión en que desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, dictó la siguiente orden: "No se admitirán fianzas después de las 10:00 de la noche ni por la Juez ni por el secretario de esta Sala." Esta orden afectó el derecho constitucional de todo acusado a permanecer en libertad o bajo fianza antes de mediar un fallo condenatorio.

Esta conducta de la querellada, Modesta Jackson Sanabria, es ilegal, impropia y reprensible del cargo de un juez de distrito.

### CUARTO CARGO

Que allá para el 30 de marzo de 1964 la querellada, Modesta Jackson Sanabria, mientras desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, celebró el matrimonio de la niña María Lourdes Marrero con José Luis Cosme Torres, teniendo entonces dicha niña menos de 14 años de edad, situación que conocía la querellada, Modesta Jackson Sanabria. La niña contrayente María Lourdes Marrero, era la perjudicada en un caso de Violación Técnica que la policía de Juana Díaz le había sometido para determinación de causa probable a la juez querellada.

Que asimismo allá para el día 17 de junio de 1964 la querellada, Modesta Jackson Sanabria, procedió a celebrar el matrimonio de la niña Sonia Santiago Muñoz, de 13 años de edad, con el joven Jaime Hernández García, sabiendo la juez querellada

que estaba impedida de celebrar dicho matrimonio por ser la contrayente menor de 14 años de edad. En este matrimonio también la niña contrayente era perjudicada en un caso de Violación Técnica que la policía de Juana Díaz le había sometido a la juez querellada para determinación de causa probable.

Esta conducta de la querellada, Modesta Jackson Sanabria, es altamente impropia, ilegal, represible e inmoral en el desempeño de su cargo de juez de distrito.

### QUINTO CARGO

Que allá en o para uno de los días del mes de marzo de 1965 la querellada, Modesta Jackson Sanabria, mientras desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, y mientras se encontraba en el recinto de dicho tribunal, intervino con el policía Ramón Antonio Rolón, placa núm. 2387, para que éste variara su declaración en una causa criminal que estaba pendiente de vista ante ese tribunal, de el Pueblo de Puerto Rico vs. Jorge Loubriel, sobre Daños Maliciosos.

En otra ocasión la querellada, Modesta Jackson Sanabria, mientras practicaba una investigación de un accidente de tránsito ocurrido en el pueblo de Juana Díaz, intervino con el menor José Antonio Santiago Rodríguez para que éste no declarara en contra del supuesto acusado, amenazándolo con enviarlo a una institución para menores.

Esta conducta de la querellada, Modesta Jackson Sanabria, es altamente inmoral, ilegal, impropia y represible del cargo que desempeña un juez de distrito.

### SEXTO CARGO

Que allá en o para uno de los días del mes de septiembre de 1965 la querellada, Modesta Jackson Sanabria, mientras desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, observó una conducta impropia, inmoral y represible en el negocio del señor Emilio Rivera, sito en el Barrio Alas de la Piedra, de Orocovis, Puerto Rico, estando en unión de los individuos Daniel Cintrón, Domingo Santiago, Arcadio Ramos (a) Cale, Manuel Álvarez Acevedo (a) El Tuerto, y otras personas violadores de la ley, haciendo uso

de bebidas alcohólicas en exceso y en aparente estado de embriaguez.

Esta conducta es altamente inmoral, impropia y reprensible del cargo que desempeña un juez de distrito.

### SEPTIMO CARGO

Que allá en o para uno de los días del mes de junio de 1964 la querellada, Modesta Jackson Sanabria, mientras desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, observó una conducta inmoral e impropia al hacer ir a su oficina a la señora Emma Rita Franceschi Serrano, mediante citación oficial servida a través de un policía, con el fin único de amonestarla en forma desconsiderada y sin motivo o querella alguna en contra de la referida señora.

Esta conducta de la juez querellada es altamente inmoral reprensible e impropia de un juez de distrito.

### OCTAVO CARGO

Que allá en o a mediados del año 1965 la querellada, Modesta Jackson Sanabria, mientras desempeñaba el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sala de Juana Díaz, y mientras se encontraba en una fiesta que se celebraba en el Barrio Maravilla, de Juana Díaz, Puerto Rico, observó una conducta impropia, inmoral y reprensible al sentarse en la falda de uno de los asistentes a dicha fiesta en presencia de las demás personas y público que se encontraba presente.

Esta conducta es altamente inmoral, impropia y reprensible en el desempeño de su cargo de un juez de distrito.

—O—

Opinión disidente del Juez Presidente Señor Negrón Fernández en la cual concurre el Juez Asociado Señor Santana Becerra.

En San Juan, Puerto Rico, a 21 de febrero de 1969

El Tribunal ha decretado la destitución de la querellada como Juez de Distrito al determinar que "todos los cargos

fueron probados y que todos tomados en conjunto justifican la destitución de la querellada." No puedo concurrir en ese resultado.

Yo también, como parte del Tribunal que escuchó la extensa y conflictiva prueba pasada en este procedimiento durante cinco días consecutivos, he buscado el fondo de verdad que el juzgador quiere siempre descubrir en la prueba que ante él desfila, para llegar a la convicción moral de la certeza de los hechos y dejar así satisfecha su conciencia judicial.

Creo que en un procedimiento contra un juez por cargos de conducta inmoral, no debemos ser menos exigentes en la norma sobre el grado de prueba requerido para la destitución—porque el procedimiento se caracterice como *sui generis* —que en la norma sobre el grado de prueba requerido para una convicción en un procedimiento de naturaleza penal. La razón me parece evidente: en un procedimiento penal se puede perder la libertad, pero ésta puede recobrarse. En un procedimiento contra un juez por cargos de conducta inmoral, la destitución por sí misma destruye su reputación como persona humana—y ésa sí que es difícil de recobrar.

La prueba en contra de la querellada, en general, está viciada por el interés, la animosidad, la persecución y algún asomo también de acción concertada conspiratoria, que no lleva a mi conciencia, en extremos de los considerados más graves por el Tribunal, la convicción moral de su veracidad; y aun en algunos de esos extremos, por las circunstancias concurrentes, como en otros que no han sido considerados tan graves, resulta insuficiente y desvirtuada en su esencia para el rigor de una penalidad de destitución, aun si hiciéramos caso omiso de la prueba de descargo. Los factores de interés, de animosidad, de persecución, de acción concertada conspiratoria, son factores vitales del proceso judicial para determinar la confiabilidad de los testimonios y poder llegar con razonable certeza a la entraña de la verdad.

Como fondo en el cuadro general de la prueba de cargo puede advertirse una alarmante y peligrosa situación, que pudiera caracterizarse de casi un estado de sitio policial de la judicatura, y en este caso de la querellada, en virtud de órdenes verbales y escritas de la Superintendencia—desde y antes del 14 de enero de 1965—de observar la conducta "de todos los magistrados, la más mínima irregularidad que cometieran reportarla." Este cuadro de vigilancia policial surge durante el testimonio del querellante,—que a continuación transcribo—el Teniente Primero de la Policía, Julio López López, quien estuvo destacado en Juana Díaz, sede de la Sala del Tribunal de Distrito que presidía la querellada, durante parte del tiempo en que ésta ejerció allí sus funciones, y a quien ésta formuló cargos ante el Superintendente de la Policía:

"HON. JUEZ BLANCO LUGO:

P. Teniente, esta mañana cuando usted declaraba, a preguntas del licenciado Viera Martínez, indicó, que había recibido órdenes escritas del Cuartel, de observar la conducta de la Juez Jackson.

R. Umjú. De todos los Magistrados, la más mínima irregularidad que cometieran reportarla.

P. ¿De qué Cuarteles es que usted ha recibido órdenes de observar la conducta de los Jueces?

R. Eh . . . Del Cuartel General y tengo el documento allí.

P. ¿Tiene el documento consigo?

R. Sí, señor. Se le puede mostrar.

P. A mi me gustaría ver ese documento.

HON. JUEZ SANTANA BECERRA:

A mi también.

R. Ordenes verbales y escritas.

"HON. JUEZ BLANCO LUGO:

P. ¿Usted tendría la bondad de buscar el documento?

R. Con mucho gusto. (Pausa.) Y tenemos dos circulares más.

HON. JUEZ PRESIDENTE:

Vaya a la silla de testigos.

R. Perdone. Tenemos dos circulares más, para informar cualquier irregularidad de cualquier funcionario, ahora, reciente.

"HON. JUEZ BLANCO LUGO:

P. Pero, ¿hay una específica, sobre los Jueces?

R. Esto no podíamos llamarle una circular, sino que éstas son reuniones que celebra el Superintendente periódicamente con todos los Jefes o los Jefes más grandes, entonces, sacan la minuta que se lleva y entonces, el Comandante de Area, reúne a todos los Comandantes de Distrito y les informan lo que hay y después, ellos mandan por escrito lo que se acordó.

P. ¿Usted tendría la bondad de mostrarle ese documento, tanto a los señores Fiscales como a la defensa?

R. Déjeme buscar y perdone. (Pausa.) Este es el documento. Digo, y una cosa. Fíjese la lista de todos los asistentes y se sacan múltiples asuntos, entre ellos ése. Déjeme buscar a ver donde está. Y esto fue lo más que motivó que yo enviara esa querella, porque estaba faltando a mi deber ya. Mírelo, aquí está subrayado, en letras rojas. Fue con fecha antes de yo enviar la querella que llegó eso.

P. ¿Las partes tienen algún reparo a que ese documento permanezca en evidencia, para ilustración del Tribunal?

LCDO. VIERA MARTÍNEZ:

Por nuestra parte ninguna.

HON. FISCAL APONTE:

Ninguna.

HON. FISCAL NORIEGA:

Por nuestra parte ninguna.

HON. FISCAL APONTE:

Por nuestra parte ninguna. Yo lo iba a echar hasta para el récord. Leer la parte pertinente para los efectos de récord. Es muy importante relacionada con el récord.

HON. JUEZ RAMÍREZ BAGES:

¿De qué fecha es?

LCDO. VIERA MARTÍNEZ:

Tiene fecha del 14 de enero de 1965.

R. Eh . . . ¿Se puede hacer una pregunta?

HON. JUEZ PRESIDENTE:

Un momento.

R. Es que eso tiene muchas cosas ahí.

HON. FISCAL APONTE:

Señores del Tribunal, apelando por la pureza del procedimiento, como ese memorial tiene otras cosas que no tienen que ver con lo envuelto en este procedimiento. . . .

R. Muchas cosas confidenciales allí.

HON. FISCAL APONTE:

No tendríamos ningún inconveniente en que vaciaran para el récord todo lo que se relaciona con los Jueces, a que se ha referido el testigo, contestando la pregunta del Hon. Juez Asociado, señor Blanco Lugo, está ahí en colorado, en rojo. Tiene otros asuntos.

LCDO. VIERA MARTÍNEZ:

Bueno, a mi me parece que el . . . el . . . el documento puede quedar, porque se refiere entre ellos a que en esa reunión estuvieron periodistas, de manera que, no era una reunión, posiblemente privada, sino. . . .

HON. FISCAL APONTE:

Pero, la parte pertinente de ese documento, a mi juicio, traída por el Honorable Juez Blanco Lugo, es sobre los Jueces.

HON. FISCAL FIGUEROA:

Y eso es lo único material y pertinente.

HON. FISCAL APONTE:

Eso es lo material y pertinente.

HON. JUEZ PRESIDENTE:

¿La propuesta del Fiscal es que se vacíe en récord esta parte?

HON. FISCAL APONTE:

El que está allí en rojo, señor Juez, sí, esa es la propuesta nuestra.

HON. JUEZ PRESIDENTE:

¿Que se vacíe en el récord?

HON. FISCAL APONTE:

Sí, señor.

HON. JUEZ PRESIDENTE:

¿Hay objeción?

LCDO. VIERA MARTÍNEZ:

No, no hay objeción.

LCDO. VELÁZQUEZ RIVERA:

No hay objeción.

LCDO. TORMES:

No tenemos objeción.

HON. JUEZ PRESIDENTE:

Entonces. . . .

LCDO. VIERA MARTÍNEZ:

¿Podría el Tribunal permitirme una o dos preguntas adicionales?

HON. JUEZ PRESIDENTE:

Sí. ¿Comó dice el letrado?

LCDO. VIERA MARTÍNEZ:

¿Podría el Tribunal permitirme una o dos preguntas adicionales, sobre este extremo al . . . ?

HON. JUEZ PRESIDENTE:

Vamos a disponer dentro de un momento.

LCDO. VIERA MARTÍNEZ:

Sí, señor.

HON. JUEZ PRESIDENTE:

Dentro de un momento continuaremos.

"HON. JUEZ BLANCO LUGO:

Al señor Secretario, si me hace el favor.

HON. JUEZ PRESIDENTE:

El documento va a marcar como identificación dos romano. Permanecerá en el récord, la parte que está encuadrada en línea roja, que se refiere al Juez y el documento en su totalidad quedará, por su naturaleza confidencial en el propio Tribunal, para vaciar en récord, la parte que se refiere a Juez, que está enmarcada en líneas rojas. El señor Secretario puede ir leyéndola.

SR. SECRETARIO:

'Actuaciones Jueces. El licenciado Olivo, distribuyó opinión reciente del Tribunal Supremo, sobre arrestos. Habló sobre entrevista con el licenciado Mangual, Administrador General de los Tribunales, quien desea saber donde se observen irregularidades de los Jueces, ausencias en fines de semana, problemas al someter casos, opiniones o actuaciones adversas,

**22**

insultos y abogados posponiendo casos, esperando jueces específicos, se envíen estos informes a operaciones de campo.'

HON. JUEZ PRESIDENTE:

Se refiere a un documento de 14 de enero de 1965, al que hizo referencia el testigo, Teniente López López. Continúe, letrado.

LCDO. VIERA MARTÍNEZ:

¿Me permite el Tribunal?

P. Eh . . . Señor Teniente López, eh . . . , ¿fue a base de ese memorando, que usted, eh . . . , se dedicó a buscar evidencia, con relación a la Juez Jackson?

R. Bueno, eso motivó que yo fuera apuntando y esas cosas, porque ya esa era una orden específica y el Comandante de Zona, que vive allí y tenía conocimiento por información de todas esas irregularidades de la Juez y viajes. . . .

P. Por eso. Pero, ¿si fue a base de ese memorando que usted mencionó?

R. Eso influyó poderosamente también.

P. Influyó poderosamente. ¿Había algún otro memorando anterior a ese de 14 de enero del '65?

R. Eh . . . Verbalmente, porque eso llega a unos cuantos meses; verbalmente ya nos habían dicho, de que cualquier irregularidad de la Juez, se lo informáramos.

P. ¿Irregularidades de quién, de la Juez?

R. De los Jueces." (¹)

---

(¹) La Sec. 24 de la Ley de la Judicatura, aprobada el 24 de julio de 1952, enmendada en varias ocasiones posteriormente, establece el procedimiento para la destitución por el Tribunal Supremo, de los Jueces del Tribunal de Primera Instancia, el cual "se iniciará mediante querella dirigida al Tribunal Supremo imputándole al juez conducta inmoral, impropia, o represible, o negligencia en sus deberes judiciales." Luego de dar a las partes la oportunidad de ser oídas en unión a sus testigos, "Si el Tribunal considerare que los cargos, o parte de ellos, han sido probados, podrá censurar o suspender al juez querellado, o destituirlo permanentemente de su cargo según, bajo las circunstancias concurrentes, creyere que sea la pena más adecuada."

Nunca ha sido norma o práctica de este Tribunal, ni de la Oficina de Administración de los Tribunales—porque sería atentatorio al prestigio e independencia judicial y a nuestro régimen constitucional—encomendar a la policía la vigilancia de los miembros de la judicatura; y mucho menos caracterizar a priori como "irregularidades de los Jueces" lo que en el texto del citado documento, vaciado en el récord de este procedimiento en

Ante ese cuadro general, y sin pretender hacer un análisis del testimonio individual de cada testigo en cuanto a su animosidad o interés en contra de la querellada, veamos brevemente algunos aspectos específicos del caso.

El Tribunal considera que el más grave de los ocho cargos imputados es el cargo quinto, que consta de dos partes; y estima probado que en dos ocasiones distintas la querellada intervino con testigos para variar ilegalmente la prueba. En la primera ocasión—se concluye por el Tribunal—la querellada intervino con el policía Ramón Antonio Rolón y lo instó a que variase su declaración. La declaración de Rolón es sencillamente increíble, porque la imputación que este testigo le hace a la querellada de que lo instó, momentos antes de un juicio por daños maliciosos contra un acusado de nombre Loubriel (en cuyo caso la querellada había encontrado causa probable y se iba a ventilar ante otro magistrado ese día) a que declarara "que en ningún momento había visto los daños, ocurridos por el ganado del señor Loubriel al señor González y que el señor Ramón Ferrer era un buscón, y el señor Loubriel era un hombre bueno" no se vincula a motivación racional o interés alguno de parte de la querellada para que ésta quisiera instar a dicho testigo a negar un hecho que a la propia querellada le sirvió de base para hacer su determinación de causa probable contra el señor Loubriel. De otro lado, tanto el perjudicado, Ramón Ferrer, como el mayordomo de su finca, eran testigos presenciales de los he-

el curso del testimonio del Teniente López López, se denomina "opiniones o actuaciones adversas", o partir de la base de que los magistrados profieren "insultos" o de que haya "abogados posponiendo casos, esperando jueces específicos", por cuanto ello constituiría un estado policial indeseable que sometería a jueces y abogados, en sus funciones judiciales y profesionales, a la supervisión y vigilancia organizada de la policía.

El texto transcrito del documento citado no representa el criterio que en el mismo se atribuye a la Oficina de Administración de los Tribunales, y en el mismo—que no es un documento emanado de la Rama Judicial—se han incluido indebidamente, ciertamente por error, actuaciones judiciales y profesionales que no corresponde a la policía juzgar.

chos que se imputaban como delito y ambos estaban presentes en el Tribunal ese día para declarar. Lo que sí surge, por el contrario, del interrogatorio de este testigo, así como de la prueba documental de la querellada, es que ésta había determinado causa probable anteriormente contra Rolón por un delito de acometimiento y agresión grave. (Exhibit F de la querellada.) Eso sí establece vinculo de interés, motivación o animosidad para desacreditar su testimonio, aparte de que el testimonio del abogado Wilfredo Colón Pagán, quien declaró como testigo de descargo, y a cuyo testimonio doy entero crédito, disipa todo vestigio de certeza en cuanto a la imputación hecha a la Juez. Así se expresó dicho letrado:

"P—Compañero Colón, ¿usted conoció al Sr. Jorge Loubriel?

R—Mi cliente.

P—¿Podría decirnos si en alguna ocasión usted lo representó en algún asunto que se tramitara en el Tribunal de Distrito de Juana Díaz?

R—Sí, señor.

P—¿Qué asunto?

R—Era un asunto donde se le acusaba a mi cliente por daños maliciosos. Porque se le habían extraviado unos animales propiedad de él y habían causado daños en unos cultivos pertenecientes a otra persona que no me acuerdo el nombre ahora.

Lic. Viera Martínez:

P—¿Usted podría decirnos qué juez determinó causa en ese asunto?

R—La determinación de causa probable fue hecha por la Hon. Juez Modesta Jackson.

P—¿Y luego se señaló la vista para juicio?

R—Sí, señor.

P—¿Compareció usted como abogado del Sr. Loubriel a este juicio?

R—Así fue.

P—¿Quién era el magistrado que presidía la Sala en ocasión en que se celebró el juicio?

R—El Hon. Norberto Benítez.

P—¿Usted conoce al policía Ramón Antonio Rolón?

R—Sí.

P—¿Tenía alguna relación ese policía con ese caso?

R—Fue el policía que investigó y sometió el caso a la Juez Jackson.

P—¿Recuerda usted haber visto al Sr. Policía Ramón Antonio Rolón en la fecha en que se iba a celebrar el juicio?

R—Sí, señor.

P—¿Puede indicar en la forma más breve posible, cómo se desarrolló el proceso en la Corte?

R—Se llamó el caso y compareció el Sr. Loubriel representado por este abogado. Se juramentaron los testigos y una vez se sentó el policía Rolón a declarar nosotros le hicimos un planteamiento de derecho al Tribunal y el Tribunal lo declaró con lugar. El planteamiento nuestro consistió en que no procedía una acción criminal contra nuestro representado por los daños que habían causado sus animales a esta vegetación o a estos frutos y sí procedía más bien una acción de daños y perjuicios donde se requiere una responsabilidad absoluta y el juez recogió nuestra moción, nuestra petición; la declaró con lugar y recomendó al perjudicado que incoara una acción civil contra nuestro defendido."

Sobre la segunda parte del cargo quinto el Tribunal concluye que la querellada "intimidó a un niño de 12 años de edad, de sexto grado de escuela, que sería testigo en un caso, para que éste no declarase en contra de determinada persona." El niño José Antonio Santiago Rodríguez, quien a la fecha de la vista ante este Tribunal dijo tener 12 años de edad, declaró que con motivo de un accidente que él había presenciado en Juana Díaz en que el señor Domingo Ramos "atrapilló" a su hijo Carlos Ramos con una *pick up* fue llevado a la corte junto a otro menor que según él había visto también el accidente, y que allí la querellada le dijo que si declaraba en contra de Domingo Ramos lo mandaba a la correccional, por lo cual no se atrevió a hablar. Este niño, por sus vacilaciones y falta de recuerdo en cuanto a algunos hechos y circunstancias que formaban parte del momento específico en que dice que la juez lo amenazó para que no declarara, resulta poco confiable, si no increíble, para de-

clarar incursa a la querellada en conducta que según palabras del Tribunal, "envuelve una inmoralidad en el más profundo sentido de la palabra", constituye "una herida mortal dirigida al corazón del procedimiento judicial: la veracidad de la prueba." Pero aparte de la poca confiabilidad en la declaración de este testigo, su testimonio es el único que se ofrece a este Tribunal para probar esa parte del cargo quinto, a pesar de que según dicho menor, al amenazarlo la juez con enviarlo a la correccional si declaraba en contra de Domingo Ramos, estaban presentes el policía, Domingo Ramos (el acusado), Carlos Ramos (el perjudicado), y un abogado. (Otro menor que también estaba presente, ya a la fecha de la vista había fallecido.) Sin embargo, el sargento Hipólito Díaz López, quien sometió el caso a la querellada, al declarar ante este Tribunal como testigo de descargo, dijo que en dicha ocasión el menor José Antonio Santiago Rodríguez y otro menor de apellido Ortiz no se ponían de acuerdo, uno decía una cosa y el otro, otra, y entonces la juez le ordenó al sargento que fuera al sitio del accidente con los testigos para que le explicaran sobre el terreno los hechos y al regresar ante la juez, estando presentes los señores Domingo y Carlos Ramos, el Lic. Wilfredo Colón y el Submárshal Díaz, continuaron discrepando los menores entre sí, determinando la juez que no había causa probable. La juez, según el sargento Díaz López, en ningún momento amenazó o instó a los menores a que no declararan contra el señor Domingo Ramos. "Nada de eso ocurrió allí" declaró el sargento. La juez, por el contrario, le hizo la observación al menor de apellido Ortiz de que allí no se iba a mentir, que dijera la verdad.

El abogado Wilfredo Colón Pagán, quien representó al acusado Domingo Ramos en la vista sobre determinación de causa probable ante la querellada, en su declaración ante este Tribunal, ratificó la declaración del sargento Díaz López en cuanto a la discrepancia y confusión entre los dos menores al

explicar los hechos, y desvirtuó totalmente la declaración del menor en que se fundó este cargo, negando que hubiere hecho la juez amenaza alguna a dichos menores, y explicando: "en la forma y manera que estos menores declararon era confuso, porque uno decía que estaba de espalda, otro decía que solamente había escuchado un chirrido de frenos, o sea, que no guardaban lógica en la forma en que se ubicaban, no había lógica en lo que decían, y a los fines de poder determinar la veracidad, pues la juez ordenó al sargento Díaz que se trasladara con los menores al lugar donde ellos decían que había ocurrido ese accidente, para que le mostraran allí dónde era que ellos se encontraban. Entonces, el sargento a su vez informase al tribunal."

A preguntas de uno de los Jueces de este Tribunal el abogado Colón Pagán declaró, además, lo siguiente:

"HON. JUEZ BLANCO LUGO:

Una pregunta, compañero. ¿Esa vista a la cual usted compareció fue varios días después de haber ocurrido los hechos que dieron margen a la queja o el mismo día?

TESTIGO:

Fue el mismo día, Hon. Juez.

HON. JUEZ BLANCO LUGO:

¿El mismo día? ¿Usted sabe si el policía, o la persona que fue a someter el caso llevaba algún proyecto de denuncia o de acusación preparada?

R—No lo recuerdo, Vuestro Honor.

P—El hijo del Sr. Ramos, o sea, el perjudicado, ¿declaró ante la Sra. Juez?

R—Sí. El declaró y sucede que esta persona está padeciendo de sus facultades mentales hace algún tiempo y con frecuencia comparecía al negocio de su padre y le insultaba pidiéndole que le diera la herencia que a él le pertenecía. El padre, cuando trataba de calmarlo, o algo, pues entonces él lo amenazaba con matar a una hijita de crianza que Don Domingo tiene, o sea, que la están criando. Ella no sabía que era hija adoptiva. Y compareció a la residencia de Don Domingo y hacía amagues con cuchillos y cosas. Y alteraba a la familia. Entonces tenían

que llamar a Don Domingo inmediatamente y era una lucha entre padre e hijo peleando por una herencia.

HON. JUEZ BLANCO LUGO:

¿Entonces, definitivamente, el día que usted compareció asistiendo a Don Domingo Ramos fue el mismo día del accidente?

TESTIGO:

El mismo día.

HON. JUEZ BLANCO LUGO:

Muchas gracias.

HON. FISCAL FIGUEROA:

Ninguna otra pregunta.

HON. JUEZ SANTANA BECERRA:

¿El hijo estaba allí presente?

TESTIGO:

Sí, señor.

HON. JUEZ SANTANA BECERRA:

¿Demostraba golpes, heridas, o algo?

TESTIGO:

No le vimos golpes ni heridas y tan es así que la que lo estaba incitando a que declarara en contra del padre era la esposa de él y tan pronto salió del tribunal nos reunimos un grupo de personas con Domingo mismo, Domingo Ramos, a ver que el hijo salió caminando normalmente. Caminando no, iba casi corriendo. Esto era más bien un feudo familiar que no tendrá solución nunca."

No veo cómo puede este Tribunal declarar probado, en sus dos modalidades imputadas, un cargo de tan graves implicaciones morales con prueba de tan dudosa credibilidad y completamente desvirtuada, sin indicio de motivación o fundamento racional alguno en la conducta humana para la derelicción del deber que se atribuye a la querellada.

El otro cargo considerado sumamente grave por el Tribunal es el séptimo, por el cual se imputa a la querellada haber citado oficialmente ante ella a la señora Emma Rita Franceschi "con el único fin de amonestarle en forma desconsiderada y sin motivo o querella alguna" en su contra.

Aunque fue impropio que la querellada, como juez, hiciera uso del poder coactivo del tribunal para hacer comparecer ante ella a una persona contra quien tenía algún motivo personal de resentimiento con el fin de hacerle amonestaciones que en todo caso, de ser procedentes, hubiere correspondido a un juez distinto hacer—de haberse quejado la querellada ante otro magistrado por los hechos que motivaron su citación a la señora Franceschi—creo que la relación previa entre ambas (la querellada había vivido durante algunos meses en la casa de la señora Franceschi) pudo haberla llevado a subestimar la importancia de esa actuación errónea. A preguntas del fiscal, la señora Franceschi declaró ante este Tribunal:

"P—Le explicó la Juez Jackson el fin de la citación, el propósito de la citación?

R—Ella me explicó que me había citado en esa ocasión para amonestarme por el hecho de que según le habían dicho a ella, yo acostumbraba a decir que ella en mi casa yo la mantenía y que ella era de color y que ella quería hacerme constar que eso le afectaba su moral y su manera de comportarse y que en esta ocasión me estaba amonestando pero que en cualquier otra ocasión me pondría presa.

HON. FISCAL VIZCARRONDO:

P—En relación a esa manifestación de la juez usted le contestó?

R—Bueno, yo sencillamente le dije a ella que me parecía que el motivo ¿verdad? de la citación era una cosa aparentemente, lo que llamamos en términos generales, chismes de comadres, porque era una cosa tan . . . tan . . . En primer lugar yo no lo había comentado. Ella me dijo que un empleado de la casa de comercio que está frente a mi casa le había dicho que yo sentada en el balcón de mi casa había hecho esos comentarios con otra persona. Que . . . da la casualidad que ella nombró la casa un día que ese negocio está cerrado ¿verdad? así que yo en realidad le dije que yo no lo había dicho. Era su palabra contra la mía. Naturalmente, ella tenía el privilegio de condenarme y yo el privilegio de defenderme.

P—Entonces ¿no había ningún caso, ninguna querella en contra suya?

R—Solamente que esa razón me dió ella. No había nadie más que ella y yo en ese cuarto.

: —Nada más."

Por lo que declaró la señora Franceschi en la vista, me parece extrema la severidad de la conclusión del Tribunal sobre este cargo. En cuanto al cargo segundo—por el que se imputa a la querellada haber increpado fuertemente de palabras a otra señora en el curso de una investigación, atribuyendo a ésta tener una casa "de lenocinio donde frecuentan parejas a tener contacto carnal"—en mi apreciación de la prueba desfilada, por las expresiones y actitud de los testigos al declarar, y ante el vicio general de que adolece la prueba de cargo que he apuntado antes, no puedo darlo por establecido.

En cuanto al cuarto cargo, que se refiere a dos matrimonios celebrados por la querellada de dos niñas de trece años de edad, es de rigor apuntar que si bien la querellada celebró dichos matrimonios—no obstante las indicaciones que le hiciera un funcionario de larga experiencia en su Sala, el Alguacil Delfín Cosme, y la prueba sobre la edad de las menores, consistente en las certificaciones de nacimiento—existen a mi juicio poderosos atenuantes, de ley y de hecho, que aminoran la inobservancia de la querellada de la incapacidad de las menores para contraer matrimonio a sus respectivas edades.

El inciso primero del Art. 83 del Código Civil de España, "base directriz del inciso 3 del 70 nuestro", *Fernández* v. *García*, 75 D.P.R. 472, 476 (1953), tal como rigió en Puerto Rico hasta la adopción de nuestro Código Civil revisado, y continúa en vigor en España, establecía la edad de pubertad legal en el varón en catorce años y en la mujer en los doce años. Los varones menores de catorce años y las mujeres menores de doce eran incapaces para contraer matrimonio.

Nuestro Código Civil siguiendo las recomendaciones de la Comisión para Revisar y Compilar las Leyes de Puerto Rico compuesta por los Comisionados Rowe, Daly y Hernández López, varió dicha edad en el varón a dieciocho años y en la mujer a dieciséis. Pero al igual que el Código Civil español, desde su adopción nuestro Código Civil contenía una cláusula de *revalidación* o convalidación, *ipso facto* y sin necesidad de declaración expresa, del matrimonio contraído por impúberes, "si un día después de haber llegado a la pubertad legal hubiesen vivido juntos sin haberse reclamado en juicio contra su validez [el Código nuestro agregó seguidamente 'las personas que legalmente los representen'], o si la mujer hubiera ['hubiese', en el nuestro] concebido antes de la pubertad legal o de haberse entablado la reclamación."

Esta cláusula sobre revalidación o convalidación *ipso facto* de matrimonios contraídos por impúberes, bajo el Código Civil español, podía únicamente comprender los casos de violación técnica según el Art. 453 del Código Penal español de 1870 igual al Art. 452 del Código Penal de 1879, edición para Cuba y Puerto Rico, que establecía como delito de violación (técnica), el yacer con una mujer menor de doce años. El disponiéndose que al Art. 70 del Código Civil nuestro se agregó por la Ley Núm. 12 de 29 de marzo de 1937 en el sentido de que "toda mujer menor de dieciséis años y mayor de catorce que haya sido seducida podrá contraer matrimonio previo el consentimiento de sus padres o tutor; y si éstos le negaren con el consentimiento de la Sala de Tribunal Superior del lugar de la residencia de la seducida, y todo varón menor de dieciocho años y mayor de dieciséis que se encontrare acusado de haber seducido a una mujer mayor de catorce y menor de dieciséis años de edad, podrá también contraer matrimonio, previo el consentimiento de sus padres o tutor y si éstos lo negaren, con el consentimiento de la Sala del Tribunal Superior del lugar de la residencia de la seducida, y se considerará suficiente para impedir todo proceso

tal matrimonio, al igual que en los demás casos a que se refiere el Artículo 262 del Código Penal", no anula la virtualidad que por sí tiene la cláusula original del propio Art. 70 del Código Civil sobre revalidación *ipso facto* de los matrimonios de varones menores de dieciocho años y de las mujeres menores de dieciséis.

La enmienda que al citado artículo de nuestro Código Civil hace la Ley de 1937, atiende los casos en que la mujer entre catorce y dieciséis años es *seducida,* y el matrimonio celebrado con el consentimiento de sus padres o en su defecto de la Sala correspondiente del Tribunal Superior, y produce un matrimonio válido, no importa la edad de la seducida, siempre que sea mayor de catorce y menor de dieciséis años de edad. Con esta disposición la enmienda de 1937 suplió la capacidad de que carecían hasta entonces las mujeres mayores de catorce y menores de dieciséis para un matrimonio válido desde su celebración. Ello, sin embargo, no suple la capacidad para contraer matrimonio de una mujer mayor de catorce y menor de dieciséis que no haya sido seducida. En tal caso, al igual que en los casos de una mujer menor de catorce años, es aplicable la disposición sobre revalidación *ipso facto* de matrimonios celebrados por mujeres impúberes, si al llegar a los dieciséis años—edad fijada por nuestro Código Civil como la edad de pubertad legal—"hubiesen vivido juntos sin haber reclamado en juicio contra su validez las personas que legalmente los representen, o si la mujer hubiese concebido antes de la pubertad legal o de haberse entablado la reclamación." El hecho de que nuestro Código Penal en su Art. 255 establezca como delito de violación el yacer con una mujer que no fuere la propia si ésta fuere menor de catorce años (delito de violación técnica), no deroga la aplicabilidad de la cláusula sobre revalidación *ipso facto* de matrimonios contraídos por mujeres menores de dieciséis años contenida en el Art. 70 de nuestro Código Civil, en tanto ese matrimonio se haya contraído por una mujer menor

de los catorce años establecidos por el Código Penal como base del delito de violación técnica. Así era en España, como antes he apuntado.

En cuanto al matrimonio celebrado el 25 de junio de 1964, en el que la contrayente había nacido el 24 de mayo de 1951, la prueba no contradicha en la vista ante este Tribunal fue que vivían felices y tenían un hijo, y habían tenido otro que murió. Este hecho conduce a la inevitable conclusión de que ese matrimonio, por razón de la concepción, conforme al Art. 70 de nuestro Código Civil quedó revalidado *ipso facto*.

Con relación al matrimonio celebrado el 30 de marzo de 1964 en el que la contrayente había nacido el 15 de junio de 1950, la declaración de un sargento de la detective tendió a demostrar que aquella se había descarriado y se radicó querella en su contra, siendo ingresada en el Hogar de Niñas. Si bien, desde luego, no se estaba litigando la conducta de la menor, no se dijo si la querella se había radicado contra ella antes de haber cumplido los dieciséis años (hecho éste que ocurrió el 15 de junio de 1966), ni hubo prueba tampoco al efecto de que, aparte de su reclusión—sobre la cual no se estableció tiempo de duración—no vivieren juntos los contrayentes ni que los padres de ella hubiesen reclamado en juicio contra la validez de dicho matrimonio antes de haber ella llegado a su pubertad legal. Sin estar en condiciones de afirmar que este matrimonio quedó revalidado *ipso facto*, conforme al Art. 70 de nuestro Código Civil, tampoco estaría en condiciones de afirmar que no lo fue.

Habida cuenta del propósito social que llevó a la juez a celebrar estos matrimonios, no obstante la incapacidad legal de las contrayentes, según nuestro Código Civil, y del hecho de que sus padres dieron el consentimiento expreso, no creo que este cargo deba ser base acumulativa para la determinación del Tribunal destituyendo a la querellada.

En cuanto al cargo tercero, todo lo que quedó en récord fue la orden equivocada dictada por la querellada, pero ninguna consecuencia de hecho quedó probada de que se afectara, como se alegó en la querella, el derecho constitucional de algún acusado a permanecer en libertad bajo fianza antes de mediar un fallo condenatorio.

En cuanto a los restantes cargos, que se refieren a la conducta personal de la juez en lugares públicos, el residuo de prueba que queda luego de descartar aquella que a mi juicio quedó desacreditada por el interés, la animosidad, la persecución y el asomo de acción conspiratoria que sirve de fondo a la querella, justificaría, en unión a lo que puede quedar de los demás cargos, una censura a la querellada y admonición en cuanto a su responsabilidad como juez para proteger la imagen que representa ante la comunidad.

La experiencia indica que la maledicencia es un hábito pobre, de valor humano negativo y de inferior valor social que puede muchas veces alcanzar a personas de probada integridad contra quienes se desee echar a rodar, por la fantasía de las gentes muchas veces y otras por la maldad, inventivas como si fueran realidades, y falsías como si fueran verdades.

Por lo anterior y bajo las circunstancias que concurren en este caso, es que no comparto la destitución decretada.